**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION**

| | |
|---|---|
| PROTESTERS IN SUPPORT OF BLACK LIVES, *et al.*, | |
| *Plaintiffs*, | Case No. 1:20-cv-6851 |
| | Hon. Charles R. Norgle Sr. |
| v. | Hon. Jeffrey T. Gilbert |
| CITY OF CHICAGO, *et al.*, | |
| *Defendants*. | |

**DEFENDANTS THE CITY OF CHICAGO AND SUPERINTENDENT DAVID BROWN'S
COMBINED MOTION TO DISMISS IN PART PLAINTIFFS' SECOND AMENDED
COMPLAINT AND MEMORANDUM OF LAW IN SUPPORT**

Allan T. Slagel
aslagel@taftlaw.com
Elizabeth E. Babbitt
ebabbitt@taftlaw.com
Brianna M. Skelly
bskelly@taftlaw.com
Paul J. Coogan
pcoogan@taftlaw.com
Andrew S. Murphy
amurphy@taftlaw.com
Special Assistants Corporation Counsel
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker Drive, Suite 2800
Chicago, Illinois 60601
(312) 527-4000

***Counsel for the City of Chicago and Superintendent David Brown***

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................... i

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 2

   1.   Plaintiffs' Allegations ............................................................................... 2

   2.   Plaintiffs' Claims Against the City & Superintendent Brown ........................... 6

   3.   Further Context for Plaintiffs' Claims ....................................................... 8

LEGAL STANDARD FOR MOTIONS TO DISMISS ................................................ 13

ARGUMENT .................................................................................................. 14

  I.   Plaintiffs Cannot Plausibly Allege That Unlawful Policies and Practices Implemented by the City or Superintendent Brown  Proximately Caused Plaintiffs Harm .............................. 14

     A.   Plaintiffs cannot plausibly allege that the City and Superintendent Brown were deliberately indifferent to Plaintiffs' constitutional rights. .................................................. 16

     B.   Plaintiffs cannot establish *Monell* liability based on the alleged action or inaction of Superintendent Brown in violation of the terms of the Consent Decree. ........................... 21

  II.   Plaintiffs Cannot Plausibly Allege That Superintendent Brown's Failure to Intervene Caused Them Harm ........................................................................................ 23

  III.   To the Extent that the Court Dismisses Plaintiffs' State Law Claims Against Any of the Individual Officers, the Court Must Also Dismiss Any Related *Respondeat Superior* and Indemnification Claims Against the City .............................................................. 26

CONCLUSION................................................................................................. 27

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Allen*,
   No. 19-cv-2311, 2020 WL 5891406 (N.D Ill. Oct. 5, 2020) ......................................19, 20, 21

*Ashcroft v. Iqbal*,
   556 U.S. 662 ............................................................................................................................14

*Auriemma v. Rice*,
   957 F.2d 397 (7th Cir. 1992) ..................................................................................................23

*Banks v. Dart*,
   No. 12-cv-8694, 2014 WL 6461582 (N.D. Ill. Nov. 18, 2014) ..............................................24

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)................................................................................................................14

*Bradford v. City of Chicago*,
   No. 16-cv-1663, 2021 WL 1208958 (N.D. Ill. Mar. 31, 2021) ..............................................26

*Carmona v. City of Chicago*,
   No. 15-cv-00462, 2018 WL 1468995 (N.D. Ill. Mar. 26, 2018) ......................................18, 19

*Coleman v. City of Peoria*,
   925 F.3d 336 (7th Cir. 2019) ..................................................................................................24

*Czosnyka v. Gardiner*,
   No. 21-cv-3240, 2021 WL 4951517 (N.D. Ill. Oct. 25, 2021) ..............................................21

*First Midwest Bank Guardian of Estate of LaPorta v. City of Chicago*,
   988 F.3d 978 (7th Cir. 2021) .............................................................................................16, 21

*Geinosky v. City of Chicago*,
   675 F.3d 743 (7th Cir. 2012) ..................................................................................................14

*Hankle-Sample v. City of Chicago*,
   No. 20-cv-1997, 2021 WL 4461557 (N.D. Ill. Sept. 29, 2021)..............................................23

*Harper v. Albert*,
   400 F.3d 1052 (7th Cir. 2005) ................................................................................................23

*Hoffman v. DuPage Cnty.*,
   No. 16-cv-9411, 2018 WL 1508486 (N.D. Ill. Mar. 27, 2018) ..............................................25

i

*McCauley v. City of Chicago,*
    671 F.3d 611 (7th Cir. 2011) .................................................................15

*McReynolds v. Merrill Lynch & Co.,*
    694 F.3d 873 (7th Cir. 2012) .................................................................13

*Monell v. Department of Social Services,*
    436 U.S. 658 (1978).................................................................... *passim*

*Montano v. City of Chicago,*
    535 F.3d 558 (7th Cir. 2008) .................................................................24

*Moore v. City of Chicago,*
    209 F.Supp. 3d 1016 (N.D. Ill. 2016) ....................................................24

*Nelson v. City of Chicago,*
    992 F.3d 599 (7th Cir. 2021) .................................................................14

*Paterakos v. City of Chicago,*
    No. 21-cv-52, 2021 WL 4635783 (N.D. Ill. Oct. 7, 2021) ....................23

*Powell v. City of Chicago,*
    2021 IL App (1st) 192145.......................................................................26

*Rosario v. Brawn,*
    670 F.3d 816 (7th Cir. 2012) .................................................................20

*Rossi v. City of Chicago,*
    790 F.3d 729 (7th Cir. 2015) .................................................................15

*Sanchez v. Garcia,*
    No. 12-cv-06347, 2015 WL 2097606 (N.D. Ill. May 4, 2015).............21

*Scherr v. Marriott Int'l, Inc.,*
    703 F.3d 1069 (7th Cir. 2013) ...............................................................14

*State of Illinois v. City of Chicago,*
    No. 1:17-cv-6260 (N.D. Ill.) ........................................................ *passim*

*Taylor v. Ways,*
    999 F.3d 478 (7th Cir. 2021) ...........................................................18, 24

*Thomas v. Cook Cnty. Sheriff's Dept.,*
    604 F.3d 293 (7th Cir. 2010) .................................................................16

*Turner v. City of Champaign,*
    979 F.3d 563 (7th Cir. 2020) .................................................................23

*United States v. Wood*,
  925 F.2d 1580 (7th Cir. 1991) ..................................................................................14

**Statutes**

735 ILCS 10/9-102 ........................................................................................................26

42 U.S.C. § 1983 ...........................................................................................7, 15, 24, 26

42 U.S.C. §§ 1985, and 1986 .........................................................................................7

Chicago Municipal Code § 2-84-040 .............................................................................3

**Other Authorities**

Federal Rule of Civil Procedure 8(a) ...........................................................................13

Federal Rule of Civil Procedure 12(f) ...........................................................................5

## INTRODUCTION

The Plaintiffs in this case are an organization called "Protesters in Support of Black Lives" and sixty individuals who allege constitutional violations arising from their attendance at protests in Chicago in the Summer of 2020. Their Second Amended Complaint (the "Complaint") names as defendants the City of Chicago (the "City"), Superintendent David Brown ("Superintendent Brown"), and 20 individual Chicago police officers (the "Officer Defendants"), plus 100 unidentified "John Doe" police officers. The only thing that ties Plaintiffs' disparate claims together is the contention that the City or Superintendent Brown are ultimately responsible for the harms that individual police officers allegedly inflicted on Plaintiffs during the protests. As relevant to this motion, Plaintiffs assert a claim against the City and Superintendent Brown under *Monell v. Department of Social Services*, 436 U.S. 658 (1978) (the *"Monell* claim"), state-law claims for *respondeat superior* and indemnification against the City, and a failure-to-intervene claim against Superintendent Brown. Plaintiffs do not seek any injunctive relief, only damages.

Plaintiffs' claims against the City and Superintendent Brown should be dismissed for several reasons, beginning with the fact that Plaintiffs have not — and cannot — plausibly allege that any injuries they suffered during the protests last year resulted from policies, practices, or customs authorized by the City or Superintendent Brown. Indeed, Plaintiffs acknowledge more than two-dozen times throughout their Complaint that the Chicago Police Department (the "Department" or "CPD") is legally obliged to comply with the Consent Decree in *State of Illinois v. City of Chicago*, No. 1:17-cv-6260, and that many of the Consent Decree's provisions relate directly to the violations Plaintiffs allege here. (Compl. ¶¶ 8, 1101, 1116–1122, 1135, 1137, 1141.) Plaintiffs' allegations regarding the Consent Decree — as well as the City's willingness to enter into the Consent Decree in the first place and spend millions of dollars on compliance — thus refute any suggestion that the City is deliberately indifferent to wrongdoing by its police

1

officers, or that any single decision maker can set Department policy unilaterally. By incorporating the requirements of the Consent Decree, Plaintiffs allege that the wrongful actions they describe violated — rather than implemented — the City's operative policies and practices. In other words, Plaintiffs have effectively pleaded their *Monell* claim out of Court because they do not plausibly allege that any injuries they sustained during the protests were the result of policies, practices, or customs sanctioned by the City or Superintendent Brown — Plaintiffs in fact allege the opposite.

Nor do Plaintiffs fare better with their non-*Monell* claims against the City and Superintendent Brown. Plaintiffs cannot plead a plausible failure-to-intervene claim against Superintendent Brown because they cannot plausibly allege facts demonstrating that he was present for and had a realistic opportunity to prevent the alleged injuries described in the Complaint. Additionally, to the extent that this Court determines that Plaintiffs have not stated plausible claims against one or more of the Officer Defendants, this Court must dismiss the related *respondeat superior* and indemnification claims against the City.

## BACKGROUND

### 1. Plaintiffs' Allegations

Plaintiffs' sprawling Complaint is 218 pages long and contains 1,245 paragraphs of allegations. The factual allegations are organized into three main sections. Section I describes, at a high level of generality, the Department's response to the 2020 protests. (Compl. ¶¶ 76–98.) Section II describes each Plaintiff's experiences at one or more protests that occurred in various locations on May 29–31, June 1, July 17, and August 15. (*Id.* ¶¶ 99–1044.) Section III traces the Department's history all the way from 1855 to the present. (*Id.* ¶¶ 1045–141.) Plaintiffs also weave additional factual allegations into the Complaint's eighteen counts. (*Id.* ¶¶ 1142–1245.)

### Section I — The Department's Response to the 2020 Protests

Section I of the Complaint describes the protests against police that swept across Chicago and the rest of the country following George Floyd's murder in May 2020. (Compl. ¶¶ 76–78.) As alleged in the Complaint, these protests were part of "the largest social justice movement in the history of the United States." (*Id.* ¶ 77.) Protests began in Chicago on May 29, 2020, and continued throughout the summer. (*Id.* ¶ 78.) They ranged in size from "a few dozen people to thousands," and they occurred "all throughout Chicago, including in the Loop and on the South, West, and North sides." (*Id.*)

Plaintiffs allege that the Department "responded to these protests with brutal, violent, and unconstitutional tactics … intended to injure and silence protesters." (Compl. ¶ 79.) Among other things, Plaintiffs allege that Chicago police officers subjected peaceful protesters to excessive force, abusive language, illegal searches and seizures, false arrest, and destruction of their property. (*Id.* ¶¶ 80–91.) Plaintiffs also allege that some Chicago police officers failed to comply with Department policies, including those requiring officers to wear body cameras and to display their names and badge numbers on their uniforms. (*Id.* ¶ 95.)

Plaintiffs allege that Superintendent Brown, "through actions both explicit and implicit, authorized and directed the unlawful conduct" described in the Complaint. (Compl. ¶ 96.) Plaintiffs invoke Chicago Municipal Code § 2-84-040, which states that the Superintendent "shall be responsible for the general management and control of the Police Department and shall have full and complete authority to administer the Department, … in a manner consistent with the ordinances of the City, the laws of the state, and the rules and regulations of the Police Board."[1]

---

[1] Plaintiffs' selective quotation of the ordinance omits the final clause, which confirms that the Superintendent must exercise his discretion "in a manner consistent with the ordinances of the City, the laws of the state, and the rules and regulations of the Police Board."

(*Id.* at ¶ 96.) Plaintiffs further allege that Brown "made all command decisions about the Chicago Police Department's systemic response to protesters during the 2020 uprisings" and that he was "physically present for at least one protest" but "failed to intervene to stop officer violence and misconduct." (*Id.*)

Plaintiffs also allege that, in response to protest-related complaints against Department officers, the Civilian Office of Police Accountability (COPA) "formed a specialized team of investigators solely dedicated to investigating these allegations." (Compl. ¶ 94 (citing https://www.chicagocopa.org/data-cases/protest-related-information/).) According to the Complaint, these investigations led to five officers being referred to state or federal law enforcement for potential criminal prosecution and eight officers being recommended for modified duty and/or to be relieved of their police powers. (*Id.*) The website Plaintiffs cite states that an additional 290 complaints were referred to the Department's Bureau of Internal Affairs.[2]

### *Section II — Plaintiffs' Individual Allegations*

At 140 pages long, Section II is by far the longest section of the Complaint, and it contains allegations about each of the 60 named Plaintiffs' individual experiences at one or more protest in Chicago in the Summer of 2020. (Compl. ¶¶ 99–1044.) The protests in question occurred on May 29–31, June 1, July 17, and August 15 in the Loop, River North, Hyde Park, Uptown, and Old Town.

In this section, Plaintiffs each allege various types of misconduct by the Officer Defendants and unknown Chicago police officers. Most of the Plaintiffs allege that excessive force was used against them, though only a few allege they sustained bodily injuries requiring medical attention. Some of the Plaintiffs also allege that they suffered from verbal abuse, unreasonable search and

---

[2] https://www.chicagocopa.org/data-cases/protest-related-information/ (visited Dec. 9, 2021).

seizure, destruction of their property, lack of medical care, and/or false arrest. All of the Plaintiffs allege that they did not provoke the police or commit any unlawful acts during the protests.

### Section III — Plaintiffs' Historical Allegations

Plaintiffs devote more than 40 pages of the Complaint to describing the Department's alleged mistreatment of the public in general and protesters in particular over the course of the last 166 years. (Compl. ¶¶ 1045–1141.) Among other events, Plaintiffs describe the Department's role in violence that occurred at the "Haymarket Incident" in 1877, protests after the death of Eugene Williams in 1919, steelworker unionization protests in 1937, protests following the assassination of Dr. Martin Luther King, Jr. in 1968, the "Marquette Park Protests" in 1976–77, various protests in the 1990s, anti-war protests in 2003, and protests at the Donald Trump rally at UIC in 2016. (*Id.* ¶¶ 1048–1101.) These historical allegations have no apparent relevance to Plaintiffs' claims other than to support Plaintiffs' assertion that "[f]or over 100 years, CPD has inflicted unjustified beatings on people exercising their right to assemble and protest." (*Id.* ¶ 1046.) Contemporaneously with the filing of this motion to dismiss, the City is also moving under Federal Rule of Civil Procedure 12(f) to strike these scandalous and irrelevant allegations.

Plaintiffs also include in Section III quotations from various social media accounts and websites, particularly from a single pseudonymous blog and Twitter account called Second City Cop. (Compl. ¶ 1102–1104, 1134.) Plaintiffs contend that these online comments are typical of the "racist, biased, and anti-protester views held by many Chicago police officers." (*Id.* ¶ 1102.) But Plaintiffs do not attribute the comments to any of the Officer Defendants, or to any other identified person. The City's motion under Rule 12(f) also requests that the Court strike from the Complaint Plaintiffs' cherry-picked quotations from social media accounts and websites.

Finally, Plaintiffs quote liberally from various reports that have been issued by or about the Department in recent years. These include the 2016 report from the Chicago Police Accountability Task Force, the 2017 report on Department practices from the Department of Justice, and the Independent Monitoring Team's ("IMT") first two reports on the City and Department's compliance with the Consent Decree. (Compl. ¶¶ 1105–37.) Of particular relevance here, Plaintiffs also quote heavily from three reports about the Department's response to the 2020 protests — one from the Department itself[3] (*id.* ¶¶ 1138–39), one from the Office of the Inspector General[4] (*id.* ¶ 1140), and one from the IMT[5] (*id.* ¶ 1141).

### 2. Plaintiffs' Claims Against the City & Superintendent Brown

Plaintiffs allege the following claims against the City: a *Monell* claim for unlawful policy or practice (Count X); a state law claim for *respondeat superior* (Count XVII); and a state law claim for indemnification (Count XVIII). Plaintiffs also name Superintendent Brown in the *Monell* claim (Count X), and in a claim for failure to intervene (Count VIII). Regarding the *Monell* claim, Plaintiffs allege that the City's "Police Department, Police Superintendent, Police Board, Mayor, and City Council" have *all* worked together to implement *thirteen* "interrelated *de facto* policies, practices, and customs" (hereinafter, "Alleged *De Facto* Policies"):

    a.    Using excessive force against protesters without justification;

    b.    Using lethal force against protesters;

---

[3] After Action Report: The Chicago Police Department's Response to Civil Unrest between May 29, 2020 and June 12, 2020 (Feb. 2021), *available at* https://home.chicagopolice.org/wp-content/uploads/2021/02/AAR_FINAL_2-4-21.pdf.

[4] City of Chicago Office of Inspector General, Report on Chicago's Response to George Floyd Protests and Unrest (Feb. 18, 2021), *available at* https://igchicago.org/wp-content/uploads/2021/02/OIG-Report-on-Chicagos-Response-to-George-Floyd-Protests-and-Unrest.pdf.

[5] Special Report: The City of Chicago's and the Chicago Police Department's Responses to Protests and Unrest under the Consent Decree (May 2020 – November 2020), *State of Illinois v. City of Chicago*, No. 17-cv-6260 (N.D. Ill. July 20, 2021), Dkt. 964 (hereinafter, "IMT Special Report"), *available at* https://cpdmonitoringteam.com/wp-content/uploads/2021/07/2021_07_20-Independent-Monitoring-Team-Special-Report-filed.pdf.

  c.  Retaliating against protesters who record the police and/or speak out against police violence;

  d.  Escalating encounters through … acts that illustrate CPD's animus toward protesters;

  e.  Falsely arresting protesters for engaging in protected speech and assembly;

  f.  Targeting those the CPD has identified as, or perceives to be, leaders, protest marshals, legal observers, and medics for excessive force and false arrest;

  g.  Giving protesters no reasonable opportunity to leave and/or trapping protesters in enclosed areas;

  h.  Using chemical agents like pepper spray and/or tear gas without prior warning;

  i.  Breaking, stealing, or otherwise disposing of protesters' belongings;

  j.  Failing to intervene to prevent police violence and other forms of misconduct;

  k.  Failing to hold officers accountable who violate protesters' rights;

  l.  Failing to train officers on how to appropriately respond to protesters; and

  m.  Maintaining, condoning, and failing to take any steps to end the code of silence in the CPD that allows Chicago police officers to violate protesters and other civilians' rights with impunity.

(Compl. ¶ 1194.) Other than to assert that these Alleged *De Facto* Policies exist, Plaintiffs offer no further details about them. On the other hand, Plaintiffs acknowledge that these Alleged *De Facto* Policies are contrary to the Department's official written policies. (*See, e.g.*, *id.* ¶ 1140(x) (discussing policy restricting circumstances in which officers may use baton strikes).)

  Plaintiffs also allege various claims against the Officer Defendants under the United States Constitution, 42 U.S.C. §§ 1983, 1985, and 1986, and Illinois state law. These include claims for excessive force in violation of the Fourth Amendment (Count I); intimidation and retaliatory use of force in violation of the First Amendment (Count II); violation of rights under the Equal Protection Clause of the Fourteenth Amendment (Count III); racially motivated conspiracy to

violate constitutional rights (Count IV); false arrest in violation of the Fourth Amendment (Count V); unlawful search and seizure in violation of the Fourth Amendment (Count VI); conspiracy to violate constitutional rights (Count VII); failure to intervene (Count VIII); failure to provide medical care (Count IX); and state law claims for violations of the Illinois Constitution (Count XI), assault and battery (Count XII), intentional infliction of emotional distress (Count XIII), false arrest (Count XIV), malicious prosecution (Count XV), and conspiracy (Count XVI). Plaintiffs seek compensatory and punitive damages, attorneys' fees, and costs. They do not request injunctive or other equitable relief.

### 3.    Further Context for Plaintiffs' Claims

In contrast to the Complaint's many allegations about events that occurred more than a century ago, the Complaint says almost nothing about the actual conditions the Department was operating under in the Summer of 2020. Though the Complaint refers to the Consent Decree some two-dozen times (Compl. ¶¶ 8, 1101, 1116–1122, 1135, 1137, 1141), it provides virtually no explanation about what the Consent Decree is or how it is administered by this Court. Likewise, the Complaint barely acknowledges the existence of the COVID-19 pandemic, or the unprecedented nature of the protests and civil unrest that jurisdictions across the country experienced following George Floyd's murder in May 2020. This context, which is not subject to reasonable dispute, is critical to evaluating the plausibility of Plaintiffs' claims.

#### *The Protests and Unrest in the Summer of 2020*

The Complaint describes the protests last summer as "the largest social justice movement in history." (Compl. ¶ 1.) But even that description does not fully convey the "unprecedented" and "record-breaking" scale of the protests that Chicago and other jurisdictions experienced after Derek Chauvin murdered George Floyd in Minneapolis on May 25, 2020. IMT SPECIAL REPORT

8

at 2–3. According to one estimate, there were more than 10,600 demonstrations across the United States from May 2020 to August 2020. *Id.* at 2 n.6. In Chicago, some of the protests drew thousands of participants each. *Id.* at 3.

The large majority of protests and people participating in protests remained peaceful. IMT SPECIAL REPORT at 1. But many cities, including Chicago, also experienced unprecedented levels of civil unrest, looting, and destruction of property. *Id.* More than 2,100 businesses were damaged or ransacked in Chicago between May 29 and June 4, 2020 alone, causing hundreds of millions of dollars in property losses.[6] Meanwhile, Chicago also experienced a large spike in calls for service and violent crime, with at least 85 people being shot and at least 24 people being killed during the first weekend of the protests and unrest. *Id.* at 16. During this same period, at least 215 Chicago police officers sustained on-duty injuries, and at least 19 Department vehicles were totaled due to vandalism. *Id.* at 7 n.28, 73, 78, 81, 85.

In short, "the City [of Chicago], like many other cities, was unprepared for the level of sustained protests and unrest downtown and throughout its neighborhoods, starting at the end of May 2020." IMT SPECIAL REPORT at 13. By June 8, 2020, nearly 100,000 National Guard members had been deployed in 34 states plus the District of Columbia "to assist state and local law enforcement in support of civil unrest operations."[7] This represented the largest deployment of National Guard members *ever* for homeland operations.[8] Chicago was among at least 80 municipalities that instituted curfews during this time. IMT SPECIAL REPORT at 3. And, Chicago

---

[6] Todd Lighty, Gary Marx, Christy Gutowski, and William Lee, *Chicago's 2020 unrest: A Tribune investigation documents the scope of the damage and its lingering impact on neighborhoods, businesses* (June 2, 2021), https://www.chicagotribune.com/investigations/ct-chicago-2020-looting-unrest-damage-george-floyd-police-killing-20210602-olbvgmfylna3jarumzonp5zkqe-htmlstory.html (cited at IMT SPECIAL REPORT at 15 n.52.)

[7] *National Guard response to civil unrest* (June 8, 2020), https://www.nationalguard.mil/Resources/Press-Releases/Article/2213005/national-guard-response-to-civil-unrest/.

[8] *Id.*

9

also hired three private security firms at a cost of $1.2 million to protect retail stores, grocery stores, and pharmacies from looters. *Id.* at 82. Nor was the Chicago Police Department the only law enforcement agency to face public scrutiny for its response to the protests and unrest — at least fifteen major American cities released some form of after-action report in the wake of last summer's events. *See id.* at 31–32.

### The COVID-19 Pandemic

Plaintiffs' Complaint also fails to acknowledge that the events Plaintiffs describe coincided with one of the worst outbreaks of communicable disease in the City's history. The Complaint's only references to the COVID-19 pandemic are a few scattered mentions of masks and social distancing. (Compl. ¶¶ 194, 494, 592, 792, 822, 840, 920, 956, 961, 975–5, 1006.) However, it should be recognized that the protests began during an early phase of the pandemic — before any vaccines were available to the public and while large public gatherings were prohibited. *See* IMT SPECIAL REPORT at 82. COVID-19 thus presented "extraordinary challenges" to the Department's efforts to respond to the unprecedented level of protest and unrest that the City experienced last summer. *Id.* at 12. More than 3,200 of the Department's officers had contracted the virus by the time the protests began, and the virus greatly complicated the Department's efforts to provide adequate training to officers and to track planned protests (because the City was not issuing permits for large gatherings). *Id.* at 6, 8, 188.

### The Consent Decree

The procedural history regarding the Consent Decree also provides important context for understanding the City's response to the protests and unrest last summer. "[T]he Consent Decree is a complex document that resulted from long and substantive negotiations between the City and the [Office of the Illinois Attorney General]." Independent Monitoring Report 4 at 2, *State of*

10

*Illinois v. City of Chicago*, No. 1:17-cv-6260 (N.D. Ill. Oct. 8, 2021), Dkt. 978, (hereinafter, "IMT REPORT 4").[9] This binding, 229-page agreement took effect in January 2019, and it requires the City to improve its policies regarding "community policing; impartial policing; crisis intervention; use of force; recruitment, hiring, and promotions; training; supervision; officer wellness and support; accountability and transparency; and data collection, analysis, and management." Consent Decree at ¶ 2, *State of Illinois v. City of Chicago*, No. 1:17-cv-6260 (N.D. Ill. Mar. 1, 2019), Dkt. 713. It also embodies the City's commitment to "continual improvement in the delivery of police services." *Id.* ¶ 5.

Although the City entered into the Consent Decree voluntarily, it will remain bound by its terms for at least five years. IMT REPORT 4 at 2. During that time, the existence of the Consent Decree will effectively prevent the City from changing Department policies without buy-in from numerous stakeholders. What is more, "the baselines set by the Consent Decree are substantial — and in many ways, themselves unprecedented." IMT SPECIAL REPORT at 220 n.392. As a result, many of the reforms that other police departments implemented in the wake of the protests last summer "were already in place in Chicago." *Id.*

Judge Dow's memorandum opinion approving the Consent Decree in January 2019 recognized the "enormous undertaking" it took just to craft the document. Memorandum Opinion and Order Approving Proposed Consent Decree at 7, *State of Illinois v. City of Chicago*, No. 1:17-cv-6260, Dkt. 702. Among other things, the Consent Decree was the product of "several hundred hours of face-to-face negotiations," "more than a dozen settlement conferences with the Court," "fourteen consent decree community roundtables," more than 10,000 comments from members of the public and various organizations, and 13 focus groups with Chicago police officers. *Id.* at 4–7.

---

[9] *Available* at https://cpdmonitoringteam.com/wp-content/uploads/2021/10/2021_10_08-Independent-Monitoring-Report-4-filed.pdf.

Judge Dow has appointed Maggie Hickey to serve as Independent Monitor and the Honorable David H. Coar to serve as Special Master over the Consent Decree. Order, *State of Illinois v. City of Chicago*, No. 1:17-cv-6260, Dkt. 713. Monitor Hickey supervises an Independent Monitoring Team consisting of more than a dozen people (the "IMT"). IMT SPECIAL REPORT at 228. In 2020 alone, the City allocated more than $25 million towards consent decree compliance and police reform efforts.[10]

To date, the IMT has issued four semi-annual reports evaluating the City's progress towards achieving compliance with the Consent Decree. The most recent report, dated October 8, 2021, lauded "the reform efforts made by many hard working City personnel" despite "a number of challenges, including the COVID-19 pandemic[,] rising violent-crime rates[,] and many leadership changes." IMT REPORT 4 at 955. Of particular relevance to this case is a 464-page Special Report that the IMT issued in July 2021 entitled "The City of Chicago's and the Chicago Police Department's Responses to Protests and Unrest under the Consent Decree (May 2020 – November 2020)."[11] Monitor Hickey notified the Court of her intention to prepare the report on June 5, 2020, mere days after the protests and unrest began. Notice Regarding Special Report, *State of Illinois v. City of Chicago*, No. 17-cv-6260, Dkt. 839. Indeed the Plaintiffs in this case thought the IMT's Special Report so relevant to their claims that they delayed filing their Second Amended Complaint by more than five months just so they could incorporate the Special Report's findings into their pleading. (*See* Dkts. 47, 50, 55, 59.)

Following the protests and unrest last summer, the City worked diligently with the IMT, Judge Dow, the Illinois Attorney General and various community groups to revise the

---

[10] *Consent Decree*, https://www.chicago.gov/city/en/sites/public-safety-and-violence-reduction/home/consent-decree.html (visited Dec. 9, 2021).

[11] *See supra* note 5.

Department's policies. In August 2020, Judge Dow held two days of "listening sessions" during which he heard testimony from members of the public about their experiences with the police last summer, including from more than a dozen of the plaintiffs in this lawsuit. *See* No. 17-cv-6260, Dkts. 860, 861. Judge Dow also received a number of written comments from members of the public. *See* No. 17-cv-6260, Dkts. 862–63, 866–884, 887–887–89, 893–94. Meanwhile, a group of community organizations known as the "Coalition"[12] — represented by some of the same lawyers who brought this lawsuit — notified the Court in July 2020 that they intended to initiate enforcement proceedings under the Consent Decree. *See* No. 17-cv-6260, Dkt. 855.

In the months that followed, the City revised and refined a number of the Department's policies. Indeed, the IMT Special Report devotes nearly 30 pages to describing all of the policy changes that the Department implemented after May 2020, as well as the Consent Decree's elaborate process for developing and reviewing such policies. *See* IMT SPECIAL REPORT at 153–182. Many of these new policies and policy revisions relate directly to the Department's response to large crowds, First Amendment activity, and unrest. "And there continues to be ongoing discussions with the City, the CPD, the [Office of the Illinois Attorney General], the Coalition, the IMT, and the federal court to improve these policies." *Id.* at 182.

## LEGAL STANDARD FOR MOTIONS TO DISMISS

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the complaint. *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 879 n.4 (7th Cir. 2012). To survive a Rule 12(b)(6) motion, the complaint must comply with Federal Rule of Civil Procedure 8(a) by

---

[12] The Coalition consists of community groups that had filed a pair of lawsuits against the City prior to entry of the Consent Decree and were given special status to participate in efforts to implement the Consent Decree. It includes 411 Movement for Pierre Loury, Black Lives Matter Chicago, Blocks Together, Brighton Park Neighborhood Council, Chicago Urban League, Justice for Families, Network 49, The Illinois State Conference of the NAACP, Chicago Westside Branch, Women's All Point Bulletin, Communities United, Community Renewal Society, ONE Northside, and Next Steps, NFP. *See* IMT SPECIAL REPORT at 21–22 n.72.

providing "a short and plain statement of the claim showing that the pleader is entitled to relief," such that the defendant is given "fair notice of what the … claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). The factual allegations in the complaint must be sufficient to raise the possibility of relief above the "speculative level." *Id.* In other words, the plaintiff must allege facts demonstrating that the plaintiff's claim is "plausible on its face" and that there is "a reasonable inference that the defendant is liable." *Id.* at 570; *Ashcroft v. Iqbal*, 556 U.S. 662, 678; *Nelson v. City of Chicago*, 992 F.3d 599, 603 (7th Cir. 2021). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Moreover, a  complaint should be dismissed under Rule 12(b)(6) "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief[.]" *Twombly*, 550 U.S. at 558.

A court may take judicial notice of documents that are in the public record without converting a Rule 12(b)(6) motion into a motion for summary judgment. *See Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1073 (7th Cir. 2013); *United States v. Wood*, 925 F.2d 1580, 1582 (7th Cir. 1991). Further, a court ruling on a Rule 12(b)(6) motion may also consider documents that are referred to in the complaint and central to the plaintiff's claims. *See Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012).

## ARGUMENT

### I.  Plaintiffs Cannot Plausibly Allege That Unlawful Policies and Practices Implemented by the City or Superintendent Brown  Proximately Caused Plaintiffs Harm

Count X of the Complaint (the "*Monell* claim") alleges that Alleged *De Facto* Practices by the City and the Department were the proximate cause of their alleged injuries. (Compl. ¶¶ 1191–

1204.) Specifically, Plaintiffs allege that the City's "Police Department, Police Superintendent, Police Board, Mayor, and City Council" have *all* worked together to implement *thirteen* "interrelated *de facto* policies, practices, and customs" that caused the injuries Plaintiffs sustained during the protests. (Compl. ¶ 1194.); *see also supra* Pg. 7–8. Plaintiffs even allege that the City "encouraged" the Department's officers to use "excessive force against protesters," including baton strikes. (*Id.* ¶¶ 1194, 1197.) Plaintiffs allege this despite acknowledging elsewhere in their Complaint that "[u]nder CPD policy, baton strikes to the head are considered lethal force and can only be used against people attempting to harm CPD officers." (*Id.* at ¶ 1140(x).)

"A government entity can be held liable under § 1983 when the execution of a government policy or custom is deemed to inflict an injury on a plaintiff." *Rossi v. City of Chicago*, 790 F.3d 729, 737 (7th Cir. 2015) (citing *Monell v. Dep't of Soc. Servs. Of New York*, 436 U.S. 658, 694 (1978)). But to hold a municipality liable, a plaintiff must demonstrate that the alleged policy or custom at issue was the moving force behind the conduct that led to the plaintiff's alleged injuries. *McCauley v. City of Chicago*, 671 F.3d 611, 618–19 (7th Cir. 2011). A plaintiff can establish *Monell* liability by proving that: (1) there is "an express policy that would cause a constitutional deprivation if enforced;" (2) there is "a common practice that is so widespread and well-settled that it constitutes a custom or usage with the force of law even though it is not authorized by written law or express policy;" or (3) "a person with final policy-making authority caused a constitutional injury." *Rossi*, 790 F.3d at 737 (citing *Lawrence v. Kenosha County*, 391 F.3d 837, 844 (7th Cir. 2004)).

Here, Plaintiffs do not allege that there is an express or written policy that caused the alleged injuries, but allege that their injuries were caused by the City's Alleged *De Facto* Policies,

and/or Superintendent Brown's implementation of the same as a final policymaker. Plaintiffs' *Monell* claim, based on either theory of liability, should be dismissed for the reasons that follow.

### A. Plaintiffs cannot plausibly allege that the City and Superintendent Brown were deliberately indifferent to Plaintiffs' constitutional rights.

The Seventh Circuit has not established any "bright-line rules defining a 'widespread custom or practice,'" and "there is no clear consensus as to how frequently such conduct must occur to impose *Monell* liability." *Thomas v. Cook Cnty. Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2010). But a plaintiff is required to provide evidence of "an implicit policy or a gap in expressed policies, or a series of violations to lay the premise of deliberate indifference." *Id.* (internal citations and quotation marks omitted); *see also First Midwest Bank Guardian of Estate of LaPorta v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021) (to hold municipality liable under *Monell*, "the plaintiff must demonstrate that the municipality's action was taken with 'deliberate indifference' to the plaintiff's constitutional rights") (internal citation and quotation marks omitted). Here, Plaintiffs' own allegations demonstrate that there are express policies in place that prohibit the very conduct they allege caused their injuries, and that the City has been anything but deliberately indifferent to the alleged constitutional violations. Plaintiffs' *Monell* claims should therefore be dismissed.

Plaintiffs allege that the City and Superintendent Brown "acted with deliberate indifference" in "implement[ing], enforce[ing], encourage[ing], and sanction[ing]" certain Alleged *De Facto* Policies that, they say, caused their injuries. (Compl. ¶¶ 1192–97.) Those allegations, however, directly contradict Plaintiffs' allegations regarding the City and the Department's implementation of and required compliance with the lawful policies and procedures prescribed by the Consent Decree. Plaintiffs allege that the Defendant Officers committed the alleged constitutional violations "despite being under a Consent Decree that compels policy and

practice reform." (*Id.* ¶ 1101.) Plaintiffs also acknowledge that the Consent Decree — a binding contract that the City negotiated and for which it has already incurred tens of millions of dollars in compliance costs — "contains a number of provisions that should have remedied the policy and practice violations described in this Complaint." (*Id.* ¶ 1116.) These include the follow specific provisions, all of which Plaintiffs quote nearly verbatim in the Complaint:

a. Chicago police officers must not use impact weapons (e.g., baton, asp, improvised impact weapons) to intentionally strike a subject in the head or neck, except when deadly force is justified;

b. When safe and feasible to do so, Chicago police officers must give verbal commands and warnings prior to, during, and after using an impact weapon;

c. Chicago police officers must receive training on proper use of an impact weapon before being permitted to carry such a weapon;

d. Chicago police officers must request appropriate medical aid for a subject who experiences an impact weapon strike when the subject appears to be in any physical distress or complains of injury, or when the subject sustained a strike to the head from an impact weapon or a hard, fixed object. Chicago police officers must render life-saving aid to the subject consistent with the officers' training until medical professionals arrive on scene;

e. Chicago police officers may only use force for a lawful purpose. Chicago police officers are prohibited from using force as punishment or retaliation, such as using force to punish or retaliate against a person for fleeing, resisting arrest, insulting an officer, or engaging in protected First Amendment activity (e.g., lawful demonstrations, protected speech, observing or filming police activity, or criticizing an officer or the officer's conduct);

f. The CPD will clarify in policy that Chicago police officers will permit members of the public to photograph and record Chicago police officers in the performance of their law enforcement duties in a public place, or in circumstances in which the officer has no reasonable expectation of privacy;

g. Chicago police officers will allow individuals to voluntarily comply with lawful orders whenever safe and feasible (e.g., allowing individuals the opportunity to submit to arrest before force is used);

h. Chicago police officers may only use OC devices for crowd dispersal when such force is necessary, objectively reasonable, and proportional to the threat presented to public safety. CPD will continue to require that the Superintendent

or his or her designee provides authorization before OC devices are used for noncompliant groups, crowds, or an individual taking part in a group or crowd; and

i. The CPD will require that all Chicago police officers interact with all members of the public in an unbiased, fair, and respectful manner. The CPD will require that officers refrain from using language or taking action intended to taunt or denigrate an individual, including using racist or derogatory language.

(Compl. ¶ 1122; Consent Decree ¶¶ 54, 58, 162–163, 208, 213–16.) The City's ongoing efforts to reform the Department's policies and practices through the Consent Decree demonstrate a deliberate intention to *remedy* the kinds of violations Plaintiffs allege, not a deliberate indifference to such violations, as is required to plead a *Monell* claim. Even before entry of the Consent Decree in January 2019, Courts rejected *Monell* claims premised on alleged "shortcomings in CPD's supervisory systems," such as those identified in the 2017 DOJ report. *Carmona v. City of Chicago*, 15-CV-00462, 2018 WL 1468995, at *4 (N.D. Ill. Mar. 26, 2018) (St. Eve, J.) (dismissing *Monell* claims at pleading stage). Such claims are even less plausible now the City has made a voluntary but binding commitment to undertake an expensive and years-long process of police reform.

This Court in *Taylor v. City of Chicago*, rejected claims nearly identical to those Plaintiffs raise here. 21 CV 2197, 2021 WL 4523203 (N.D. Ill. Oct. 4, 2021). The plaintiff in *Taylor* cited the 2017 DOJ report, as well as the City's failure to meet some of the Consent Decree's deadlines, in support of his claim that the City had "engaged in a pattern or practice of unreasonable force in violation of the Fourth Amendment and that the deficiencies in CPD's training, supervision, accountability, and other systems have contributed to that pattern or practice." *Id. *2. With respect to the DOJ report, the Court concluded that "the passage of time since the DOJ report diminishes its usefulness as an allegation of the practices in place" in 2019. *Id. *3. Likewise, with respect to the IMT reports, the Court concluded that they suggested, at most, that "the police department had

not implemented every reform," which added nothing to the plaintiff's conclusory allegation that the City was deliberately indifferent to certain alleged *de facto* policies. *Id.*

"Even without the extraordinary challenges from the COVID-19 pandemic, there is no quick fix to the policing challenges that the City, the CPD, and Chicago's communities faced in 2020." IMT SPECIAL REPORT at 12. Plaintiffs allege serious and troubling violations of Department policy by some Chicago police officers. If Plaintiffs' allegations are substantiated, the Department will take appropriate disciplinary action, and Plaintiffs may recover for any violations of their rights by those officers. Likewise, the City concedes that the Department did not have the "polices, reporting practices, training, equipment, data analysis, community engagement or inter agency coordination required to respond effectively" to the unprecedented protests and unrest last year. (Compl. ¶ 1141(ii) (citing IMT SPECIAL REPORT at 14).) But that is precisely why the City has undertaken major revisions to the Department's policies related to crowd responses in the wake of the protests, with input from the Office of the Illinois Attorney General, the IMT, the federal court, and various community groups. *See* IMT SPECIAL REPORT at 150–66.

A recent case involving a settlement agreement between the City and the ACLU is instructive. *See Anderson v. Allen*, Case No. 19-cv-2311, 2020 WL 5891406 (N.D Ill. Oct. 5, 2020). The plaintiff in that case alleged that he was falsely arrested as a result of the Department's custom or practice of engaging in unconstitutional investigatory stops. *Id.* at *4. This Court granted the City's motion to dismiss the plaintiff's *Monell* claim in part because the plaintiff had failed to adequately plead that the alleged custom or practice caused his false arrest. *Id.* The Court added that even if the plaintiff had sufficiently linked his claim to a custom or practice of false arrests, his *Monell* claim failed because he could not establish that the City was deliberately indifferent to the problem. *Id.* at *4 n.2. The plaintiff sought to rely on a report regarding racial disparities in the

Department's investigatory stops, which ultimately had led to a settlement agreement between the City and the ACLU regarding the practice. *Id.* at *3. Citing the settlement agreement, the Court found that "the City took deliberate action to significantly *decrease* the number of street stops on African Americans at the time of [the plaintiff's] arrest." *Id.* at *4 n.2. Therefore, "[a]lthough police reforms are far from complete," the settlement agreement established the City's "deliberate intention to reform and improve policing practices, not deliberate indifference to the problem." *Id.*

Other allegations in the Complaint besides its references to the Consent Decree confirm the City's ongoing commitment to police reform. For example, the Complaint alleges that COPA set up a specialized team of investigators to review protest-related complaints from the public, and has already referred some officers to law enforcement for potential criminal prosecution and recommend that some officers be assigned to modified duty and/or relieved of police power. (Compl. ¶ 94.) The Complaint also quotes a recorded speech in which Superintendent Brown told a class of new recruits in October 2020 that they would need to "discern right from wrong" and that it was his job as Superintendent to "hold [them] accountable to do the job the right way, all the time."[13] Brown concluded the same speech by predicting that history would thank the recruits for "saving our democracy because [they] did the job the right way."[14]

In sum, Plaintiffs cannot show deliberate indifference simply by alleging that the City and the Department have not yet eradicated all instances of constitutional violations in policing. *See Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012) ("We have consistently held that deliberate indifference requires a showing of more than mere or gross negligence."); *see also*

---

[13] *'This Civil Unrest Is About You': Police Superintendent David Brown Gives Passionate Speech To New Recruits*, (Oct. 13, 2020), https://www.nbcchicago.com/top-videos-home/this-civil-unrest-is-about-you-police-superintendent-david-brown-gives-passionate-speech-to-new-recruits/2353284/ (cited at Compl. ¶ 98).
[14] *Id.*

*Czosnyka v. Gardiner*, 21-CV-3240, 2021 WL 4951517, at *2 (N.D. Ill. Oct. 25, 2021) (dismissing *Monell* claim at pleading stage because Mayor's request that Inspector General investigate alleged misconduct demonstrated that City was not deliberately indifferent to misconduct); *Sanchez v. Garcia*, 12 C 06347, 2015 WL 2097606, at *4 (N.D. Ill. May 4, 2015) ("To suggest that the existence of the consent decree somehow supports an inference that Cermak ignores that same consent decree is circular."). Deliberate indifference is a "high bar," which requires Plaintiffs to "prove that it was obvious that the municipality's action would lead to constitutional violations and that the municipality consciously disregarded those consequences." *Estate of LaPorta*, 988 F.3d at 987. But the Consent Decree's very existence demonstrates the City's "deliberate intention to reform and improve policing practices" — the exact opposite of deliberate indifference. *See Anderson*, 2020 WL 5891406 at *4 n.2.

      **B.**    **Plaintiffs cannot establish *Monell* liability based on the alleged action or inaction of Superintendent Brown in violation of the terms of the Consent Decree.**

Plaintiffs also attempt to pursue *Monell* liability by claiming that the Alleged *De Facto* Policies they identify were implemented and encouraged by Superintendent Brown as the Department's final policy maker. *See* (Compl. ¶ 1199.) But, here again, Plaintiffs allege that Superintendent Brown acted outside of the City's express policies — which are contained in the Consent Decree — when he supposedly allowed and encouraged the constitutional violations to occur. In other words, Plaintiffs have alleged that Superintendent Brown directly violated the City's policies, and therefore, have failed to state a basis for *Monell* liability.

While Plaintiffs allege in general terms that the Defendant Officers acted pursuant to certain Alleged *De Facto* Policies (*see* Compl. ¶ 1193), they also allege repeatedly that the Consent Decree requires the Department's compliance with lawful policies and procedures developed with input from various stakeholders, including the IMT and this Court. (*See id.* ¶ 8 ("These systemic

and ongoing violations continue to occur despite the City of Chicago being subject to a Consent Decree for almost two years."); ¶ 11 ("CPD's policies and practices of using excessive force and abuse tactics against protesters continued through the Summer of 2020 … despite being under a Consent Decree that compels policy and practice reform."); ¶ 1122 (identifying specific Consent Decree provisions that "were intended to prevent the injuries detailed in this Complaint").) Plaintiffs acknowledge that the Consent Decree establishes the policies by which the City, the Department, and Superintendent Brown must abide. Thus, any action, or inaction, on the part of Superintendent Brown that caused Plaintiffs' alleged constitutional violations was necessarily done in violation of the City's express policies.

This Court in *Lanahan v. County of Cook*, dismissed a *Monell* claim against Cook County when confronted with an analogous set of allegations. No. 16-cv-11723, 2018 WL 1784139 (N.D. Ill. Apr. 13, 2018). In that case, the plaintiff alleged that she was retaliated against for raising allegations of violations of the *Shakman* consent decree, which prohibits the City and Cook County from engaging in political discrimination in their employment practices. *Id.* at *1. In support of her *Monell* claim against the County, the plaintiff alleged that "a person with policymaking authority for the County, namely, Inspector General Blanchard, caused her constitutional injuries by spearheading the fraudulent investigation into her *Shakman* claims." *Id.* at *12. The Court disagreed, explaining that the Inspector General is not responsible for the County's policy on how complaints of political discrimination are handled. *Id.* Instead, "[t]hat policy is set forth in the *Shakman* decree" itself. Therefore, the Court dismissed plaintiff's *Monell* claim because "despite what [plaintiff] may think, the decree … is what embodies the County's policy of investigating claims of political discrimination and retaliation." *Id.*

22

Plaintiffs' allegations regarding the Consent Decree and its requirements are inconsistent with their allegations that Superintendent Brown was implementing City policy in a manner that caused Plaintiffs' alleged constitutional injuries. However, the Seventh Circuit has made clear that "[l]iability for unauthorized acts is personal; to hold the municipality liable, *Monell* tells us, the agent's actions must implement rather than frustrate the government's policy." *Auriemma v. Rice*, 957 F.2d 397, 400 (7th Cir. 1992). As such, Plaintiffs' *Monell* claim against Superintendent Brown should be dismissed as well. *See Hankle-Sample v. City of Chicago*, No. 20-cv-1997, 2021 WL 4461557, at *13 n.7 (N.D. Ill. Sept. 29, 2021) (dismissing *Monell* claims where plaintiff failed to plausibly allege that City policymakers were "moving force" behind widespread custom and practice); *Paterakos v. City of Chicago*, No. 21-cv-52, 2021 WL 4635783, at *4 (N.D. Ill. Oct. 7, 2021) (same where plaintiff failed to plausibly allege supervisor was final policymaker for City).

## II.    Plaintiffs Cannot Plausibly Allege That Superintendent Brown's Failure to Intervene Caused Them Harm

Count VIII of the Complaint alleges claims for failure to intervene against all of the individual Defendant Officers, as well as Superintendent Brown in his individual capacity. (Compl. ¶¶ 1181–85.) Specifically, Count VIII alleges that Superintendent Brown "stood by without intervening to prevent the violation of Plaintiffs' constitutional rights under the First, Fourth, and Fourteenth Amendments, even though [he] had the opportunity to do so." (*Id.* ¶ 1183.)

To establish a failure-to-intervene claim, a plaintiff must first establish that a constitutional violation occurred. *See Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005). Thus, if this Court determines that Plaintiffs have failed to plausibly allege underlying constitutional violations by any the individual Officer Defendants, any related failure-to-intervene claims fail too. *See Turner v. City of Champaign*, 979 F.3d 563, 571 (7th Cir. 2020) (affirming dismissal of failure-to-

intervene claim because plaintiff failed to demonstrate underlying constitutional violation); *Coleman v. City of Peoria*, 925 F.3d 336, 351 (7th Cir. 2019) (same).

However, even if Plaintiffs could clear their burden of pleading plausible underlying constitutional violations by the Officer Defendants, Plaintiffs could not plausibly allege a failure-to-intervene claim against Superintendent Brown. For a supervisor to be directly liable under 42 U.S.C. § 1983 for a subordinate's constitutional violation, the supervisor must "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Taylor v. Ways*, 999 F.3d 478, 494 (7th Cir. 2021) (quoting *Matthews v. City of East St. Louis*, 675 F.3d 703, 707 (7th Cir. 2012)). In other words, the plaintiff must show that the superior "had a realistic opportunity to intervene to prevent the harm from occurring." *See Montano v. City of Chicago*, 535 F.3d 558, 569 (7th Cir. 2008) (quoting *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994)). This Court has held routinely that officers who are not present at the scene of alleged constitutional violations generally do not have a realistic opportunity to prevent them, and therefore, cannot be liable for failure to intervene. *See, e.g.*, *Moore v. City of Chicago*, 209 F.Supp. 3d 1016, 1033 (N.D. Ill. 2016) ("Police officers who were not present on the scene cannot be held liable for failing to intervene in another officer's unconstitutional acts."); *Banks v. Dart*, No. 12-cv-8694, 2014 WL 6461582, *3 (N.D. Ill. Nov. 18, 2014) (recognizing that defendants who were not present during alleged use of excessive force could not be liable for failing to intervene).

The Complaint describes various alleged underlying interactions between the Plaintiffs and both named and unnamed police officers, but none of those descriptions includes an allegation that Superintendent Brown was present with the realistic opportunity to intervene. (Compl. ¶¶ 100–1044.) The closest Plaintiffs come to alleging Superintendent Brown's personal involvement is to

24

state that he was "physically present for at least one protest where he described standing 'shoulder to shoulder' with Chicago police officers," and that "[d]uring the protest(s) Superintendent Brown attended personally, he failed to intervene to stop officer violence and misconduct." (*Id.* ¶ 96.) Notably, the Complaint does not indicate where or when Superintendent Brown stood "shoulder to shoulder" with any of the Officer Defendants, or on which Plaintiffs' behalf he should have intervened. The Complaint's generic allegations are thus inadequate to support a claim for failure to intervene by Superintendent Brown, particularly because Plaintiffs have alleged dozens of individual incidents of "violence and misconduct" that occurred on six different dates at locations all over the City. *See, e.g.*, *Hoffman v. DuPage Cnty.*, No. 16-cv-9411, 2018 WL 1508486, *4 (N.D. Ill. Mar. 27, 2018) (dismissing failure to intervene claim where complaint recited elements of claim, but factual allegations did not allow for inference that defendants "observed one another, let alone that any could have or should have intervened").

Nor can Plaintiffs salvage their failure-to-intervene claim with their allegation that "Superintendent Brown made all command decisions about the Chicago Police Department's systemic response to protesters during the 2020 uprisings … and took no action to halt Chicago police officer's systemic violence against protesters for Black lives." (Compl. ¶ 96.) Plaintiffs' claims are premised on isolated incidents that occurred on six days over a period of approximately 10 weeks, and Plaintiffs do not allege that the constitutional violations were committed by Superintendent Brown's direct subordinates with his knowledge. Instead, Plaintiffs' claim is premised on the generic allegation that Superintendent Brown — along with every other individual Defendant — "stood by without intervening to prevent" the specific violations of the individual Plaintiffs' rights alleged in the Complaint. (*Id.* ¶ 1183.) Without more, Plaintiffs have not sufficiently alleged that Superintendent Brown was present for any of the underlying alleged

25

violations with a realistic opportunity to prevent them. The failure-to-intervene claim against Superintendent Brown should be dismissed accordingly.

### III. To the Extent that the Court Dismisses Plaintiffs' State Law Claims Against Any of the Individual Officers, the Court Must Also Dismiss Any Related *Respondeat Superior* and Indemnification Claims Against the City

"[T]he doctrine of *respondeat superior* is not a basis for rendering municipalities liable under § 1983 for the constitutional torts of their employees." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 663 n.7 (1978). Nonetheless, plaintiffs allege a *respondeat superior* claim against the City for any state law violations committed by the Defendant Officers. (Compl. ¶¶ 1238–41.) Plaintiffs also allege that 735 ILCS 10/9-102 requires the City "to pay any tort judgement damages for compensatory damages for which employees are liable within the scope of their employment activities." (*Id.* ¶ 1244.)

Both of these derivative claims against the City will fail if the Defendant Officers were acting outside the scope of their employment during the events described in the Complaint. *See Powell v. City of Chicago*, 2021 IL App (1st) 192145, ¶ 38 (affirming dismissal of *respondeat superior* claim where court concluded as matter of law that alleged assault was outside scope of employee's employment). At this early stage of the proceedings, it is neither appropriate nor feasible for the City to opine whether the Defendant Officers identified in the Complaint were acting within the scope of their employment during the events described in the Complaint. Thus, the City reserves the right to assert this defense to derivative liability depending on any facts that are adduced in discovery.

For now, the City merely observes that, to the extent this Court dismisses any state law claims against any of the Defendant Officers, it must also dismiss the related *respondeat superior* and indemnification claims against the City. *See Bradford v. City of Chicago,* No. 16-cv-1663,

2021 WL 1208958, at *9 (N.D. Ill. Mar. 31, 2021) (dismissing *respondeat superior* and indemnification claims against City where underlying claims against employees had been dismissed).

## CONCLUSION

For the reasons discussed above, Defendants City of Chicago and Superintendent David Brown respectfully request that the Court enter an order dismissing Counts VIII and X of the Second Amended Complaint with prejudice and granting such further relief that this Court deems necessary and just.

Dated: December 13, 2021

Respectfully submitted,

CELIA MEZA
Corporation Counsel of the
**CITY OF CHICAGO**

By: /s/ Allan T. Slagel
Special Assistant Corporation Counsel

Allan T. Slagel
aslagel@taftlaw.com
Elizabeth E. Babbitt
ebabbitt@taftlaw.com
Brianna Skelly
bskelly@taftlaw.com
Paul J. Coogan
pcoogan@taftlaw.com
Andrew S. Murphy
amurphy@taftlaw.com
Special Assistants Corporation Counsel
**TAFT STETTINIUS & HOLLISTER LLP**
111 East Wacker Drive, Suite 2800
Chicago, Illinois 60601
(312) 527-4000

***Counsel for City of Chicago and Superintendent David Brown***

27

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that, on December 13, 2021, he caused a true and correct copy of the foregoing Defendants the City of Chicago and Superintendent David Brown's Combined Motion to Dismiss in Part Plaintiffs' Second Amended Complaint to be filed electronically with the Court's CM/ECF system, which caused an electronic copy of this filing to be served on counsel of record.

/s/ Allan T. Slagel
Special Assistant Corporation Counsel