**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS,**
**EASTERN DIVISION**

| | | |
|---|---|---|
| PROTESTERS IN SUPPORT OF BLACK LIVES, *et al.*, | ) ) ) | No. 1:20-cv-06851 |
| Plaintiffs, | ) ) | |
| v. | ) ) | Judge Charles R. Norgle |
| | | Magistrate Judge Jeffrey T. Gilbert |
| CITY OF CHICAGO, *et al.*, | ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS CITY OF CHICAGO AND
SUPERINTENDENT BROWN'S COMBINED MOTION TO DISMISS IN PART
<u>PLAINTIFFS' SECOND AMENDED COMPLAINT</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................iii

INTRODUCTION ............................................................................................. 1

SUMMARY OF FACTUAL ALLEGATIONS ................................................. 3

STANDARD OF REVIEW.................................................................................. 5

ARGUMENT ..................................................................................................... 6

    I.     Defendants' Motion to Dismiss Begins by Asserting Additional
         Facts Not Contained in Plaintiffs' Complaint Which Must be
         Disregarded by This Court ........................................................... 6

    II.    Plaintiffs Have Properly Alleged a *Monell* Claim Against
         the City of Chicago and Superintendent Brown (Count X)........................................ 11

        A.    Plaintiffs have properly alleged that CPD's widespread practices
            caused their injuries and that the City and Superintendent Brown
            were deliberately indifferent ............................................... 12

            i.     Plaintiffs alleged that CPD has a long history of widespread policy
                and practice failures........................................................ 13

            ii.    Plaintiffs allege that various government reports and protest-related
                after action reports support their *Monell* allegations .................................... 15

            iii.   Contrary to Defendants' arguments, the existence of the Consent
                Decree and Defendants' Decree violations support Plaintiffs'
                 *Monell* claims ............................................................. 20

        B.    Plaintiffs have properly alleged a theory of *Monell* liability based on
            the actions of Superintendent Brown as a final policymaker ............................ 25

    III.   Plaintiffs Have Properly Alleged a Failure to Intervene
         Claim Against Superintendent Brown (Count VIII)................................... 29

IV.    Plaintiffs Have Properly Alleged Respondeat Superior and

Indemnification Claims Against the City (Counts XVII and XVIII) ........................ 33

**CONCLUSION**................................................................................................................................. **33**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdullahi v. City of Madison*,
423 F.3d 763 (7th Cir. 2005) .................................................................................30

*Adams v. City of Indianapolis*,
742 F.3d 720 (7th Cir. 2014) ...................................................................................5

*Anderson v. Allen*,
No. 19-cv-2311, 2020 WL 5891406 (N.D Ill. Oct. 5, 2020) ...........................24, 25

*Archie v. City of Chicago*,
No. 19 CV 4838, 2020 WL 5751185 (N.D. Ill. Sept. 25, 2020) .............................19

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................................................................................6

*Baker v. City of Chicago*,
483 F. Supp. 3d 543 (N.D. Ill. 2020).....................................................................32

*Bell v. Twombly*,
550 U.S. 544 (2007) ..............................................................................................5, 6

*Bennett v. Serpas*,
No. 15-3087, 2017 WL 2778109 (E.D. La. June 26, 2017) ...................................21

*United States ex rel. Berkowitz v. Automation Aids, Inc.*,
896 F.3d 834 (7th Cir. 2018) ...................................................................................6

*Calhoun v. Ramsey*,
408 F.3d 375 (7th Cir. 2005) .................................................................................13

*Carmona v. City of Chicago*,
15-CV-00462, 2018 WL 1468995 (N.D. Ill. Mar. 26, 2018) ................................25

*Chatman v. City of Chicago*,
No. 14 C 2945, 2015 WL 1090965 (N.D. Ill. Mar. 10, 2015)................................5

*Clark v. City of Chicago*,
No. 10 C 1803, 2010 WL 4781467 (N.D. Ill. Nov. 17, 2010) ...............................32

*Connick v. Thompson*,
563 U.S. 51 (2011) .................................................................................................15

*Craftwood II, Inc. v. Generac Power Sys., Inc.*,
    920 F.3d 479 (7th Cir. 2019) ..........................................................................6, 9

*Crusick v. Gualandri*,
    No. 20-cv-06017, 2021 WL 5447041 (N.D. Ill. Nov. 22, 2021)............................31

*Czosnyka v. Gardiner*,
    21-CV-3240, 2021 WL 4951517 (N.D. Ill. Oct. 25, 2021)...................................25

*Diocese of Brooklyn v. Cuomo*,
    141 S. Ct. 63 (2020) ...........................................................................................9

*Dolson v. Vill. of Washingtonville*,
    382 F. Supp. 2d 598 (S.D.N.Y. 2005) ...............................................................11

*Driscoll v. Juris Kins & Davis McGrath, L.L.C.*,
    No. 16 C 9359, 2017 WL 4122715 (N.D. Ill. Sept. 18, 2017) ...............................5

*E.E.O.C. v. O & G Spring and Wire Forms Specialty Co.*,
    705 F. Supp. 400 (N.D. Ill. 1988), *aff'd* 38 F.3d 872 (7th Cir. 1994) ........................ *passim*

*EEOC v. Chicago Miniature Lamp Works*,
    622 F. Supp. 1281 (N.D. Ill. 1985)....................................................................14

*Fix v. City of Chicago*,
    Nos. 21-cv-2843 and 21-cv-2846, 2022 WL 93503 (N.D. Ill. Jan. 10, 2022) .............. *passim*

*Flores Delgado v. City of Chicago*,
    No. 18-cv-06378, 2021 WL 2784304 (N.D. Ill. July 2, 2021)..............................18

*Gable v. City of Chicago*,
    296 F.3d 531 (7th Cir. 2002) ............................................................................12

*Harper v. Albert*,
    400 F.3d 1052 (7th Cir. 2005) ..........................................................................29

*Hendrick v. Bryant*,
    No. 20-cv-00249, 2021 WL 4502159 (N.D. Ill. Sept. 30, 2021) ................1, 21, 23

*Hill v. City of Harvey*,
    17 C 4699, 2018 WL 278720 (N.D. Ill. Jan. 3, 2018)........................................19

*Hill v. Cook County*,
    463 F. Supp. 3d 820 (N.D. Ill. 2020)..................................................................14

*Howard v. Sheriff of Cook County*,
    No. 15 C 9384, 2016 WL 4366598 (N.D. Ill. Aug. 16, 2016) .........................19, 21

*J.K.J. v. Polk County*,
   960 F.3d 367 (7th Cir. 2020) ........................................................................15

*Keyes v. School Dist. No. 1*,
   413 U.S. 189 (1973) ................................................................................14, 15

*LaPorta v. City of Chicago*,
   102 F. Supp. 3d 1014 (N.D. Ill. 2015) ..........................................................20

*Lark v. City of Evanston*,
   No. 16 C 4630, 2017 WL 41361 (N.D. Ill. Jan. 31, 2017) ............................32

*Lewis v. Downey*,
   581 F.3d 467 (7th Cir. 2009) .........................................................................29

*Logan v. City of Evanston*,
   No. 20 C 1323, 2020 WL 6020487 (N.D. Ill. Oct. 12, 2020) ........................29

*Mays v. Dart*,
   453 F. Supp. 3d 1074 (N.D. Ill. 2020), *aff'd in relevant part*, 974 F.3d 810
   (7th Cir. 2020) .................................................................................................9

*McGaughey v. City of Chicago*,
   No. 84 C 10546, 1987 WL 12213 (N.D. Ill. June 9, 1987) ...........................11

*McMillian v. Monroe Cty., Ala.*,
   520 U.S. 781 (1997) .......................................................................................25

*Mendez v. City of Chicago*,
   No. 18 C 6313, 2019 WL 4934698 (N.D. Ill. Oct. 7, 2019) .....................19, 23

*Miller v. Gonzalez*,
   761 F.3d 882 (7th Cir. 2014) .........................................................................30

*Monell v. Dep't of Soc. Servs.*,
   436 U.S. 658 (1978) ................................................................................ *passim*

*In re New York City During Summer 2020 Demonstrations*,
   No. 20-cv-8924, 2021 WL 2894764 (S.D.N.Y. July 9, 2021) .....................9, 14

*Pembaur v. City of Cincinnati*,
   475 U.S. 469 (1986) .......................................................................................26

*Phillips v. Bratton*,
   No. 07-873, 2008 WL 11409876 (C.D. Cal. Jan. 28, 2008) ......................2, 21

*Riley v. Cty. of Cook*,
   682 F. Supp. 2d 856 (N.D. Ill. 2010) .............................................................20

*Robernhorst v. Dematic Corp.*,
No. 05 C 3192, 2008 WL 1821519 (N.D. Ill. Apr. 22, 2008) ...............................11

*Sanchez v. Garcia*,
12 C 06347, 2015 WL 2097606 (N.D. Ill. May 4, 2015) ......................................25

*Sanders v. Sheehan*,
No. 09 C 7707, 2010 WL 2990121 (N.D. Ill. July 26, 2010) ...............................20

*Santiago v. Walls*,
599 F.3d 749 (7th Cir. 2010) ................................................................................6

*Savory v. Cannon*,
532 F. Supp. 3d 628 (N.D. Ill. 2021) ..................................................................13

*Shields v. City of Chicago*,
No. 17 C 6689, 2018 WL 1138553 (N.D. Ill. March 2, 2018) ............................19

*Estate of Sims ex rel. Sims v. Cty. of Bureau*,
506 F.3d 509 (7th Cir. 2007) ........................................................................12, 25

*Smith v. Burge*,
222 F. Supp. 3d 669 (N.D. Ill. 2016) ......................................................6, 29, 32

*Smith v. City of Chicago*,
143 F. Supp. 3d 741 (N.D. Ill. 2015) ..................................................................20

*Spalding v. City of Chicago*,
24 F. Supp. 3d 765 (N.D. Ill. 2014) ....................................................................29

*Spearman v. Elizondo*,
230 F. Supp. 3d 888 (N.D. Ill. 2016) ..................................................................19

*Tamayo v. Blagojevich*,
526 F.3d 1074 (7th Cir. 2008) ..............................................................................5

*Taylor v. City of Chicago*,
No. 21 C 2197, 2021 WL 4523203 (N.D. Ill. Oct. 4, 2021) ...............................24

*United States v. LaSalle Bank, N.A.*,
No. 07 C 6196, 2008 WL 4874169 (N.D. Ill. July 29, 2008) ...............................6

*Vega v. Chicago Park District*,
954 F.3d 996 (7th Cir. 2020) ..............................................................................14

*Vodak v. City of Chicago*,
639 F.3d 738 (7th Cir. 2011) ........................................................................26, 28

*Widmaier v. City of Newark*,
No. 16-2533, 2019 WL 1895087 (D.N.J. Apr. 29, 2019) ...................................................2, 21

*Yang v. Hardin*,
37 F.3d 282 (7th Cir. 1994) ........................................................................................................29

*Zimmerman v. Tribble*,
226 F.3d 568 (7th Cir. 2000) ........................................................................................................6

Defendants City of Chicago and Superintendent David Brown have moved to dismiss Plaintiffs' Second Amended Complaint, contending that Plaintiffs fail to state plausible claims for relief. Dkt. No. 69. Defendants' motion should be denied.

## INTRODUCTION

In the wake of the May 2020 murder of George Floyd, a Black man who suffocated to death while a white Minneapolis police officer knelt on his neck, millions of people across the world took to the streets to protest racialized police violence. Plaintiffs in this case are sixty individuals who, during the summer of 2020, protested in the streets of Chicago as part of this world-wide mobilization. Like other cities around the country, the Chicago Police Department ("CPD") and the City of Chicago responded to protesters with unjustified violence and unlawful retaliation. Throughout the summer of 2020, during numerous protests across the City, CPD officers responded to Plaintiffs' protests with unjustified and retaliatory physical violence, false arrests, malicious prosecutions, seizures of property, some of which was destroyed, and verbal harassment. The harms Plaintiffs suffered resulted directly from the City of Chicago's and CPD's *de facto* policies and practices, including, but not limited to, using unjustified and often lethal force against protesters, retaliating against protesters who speak out against police violence, engaging in false and retaliatory arrests, failing to adequately train officers to respond to protest, and failing to hold accountable officers who engage in policy violations and unlawful conduct.

Plaintiffs, many of whom protested in different locations on different days during the summer of 2020, suffered a clear pattern of injuries as a result of CPD's *de facto* policies and practices. Twenty-one Plaintiffs suffered head injuries as a result of CPD officers using lethal baton strikes and other forms of unlawful force against peaceful protesters. CPD officers used unjustified force when they shoved, pushed, or otherwise used force in a manner that forced

1

thirty Plaintiffs to the ground.  CPD officers unlawfully targeted eighteen Plaintiffs with chemical agents, causing them excruciating, burning pain.  CPD officers subjected fifteen Plaintiffs to false and retaliatory arrests and unlawfully seized the property of ten Plaintiffs. CPD officers verbally harassed, taunted, and/or used slurs when addressing eleven Plaintiffs.

Multiple independent sources documented CPD's widespread policy and practice failures that caused Plaintiffs' harm—including the Office of the Inspector General, the Independent Monitor for the CPD Consent Decree, and the CPD itself.  Despite CPD's own admissions of its policy and practice failures during the summer of 2020 protests, Defendants now argue that the existence of the Consent Decree governing CPD operations defeats Plaintiffs' *Monell* claim and that Superintendent Brown cannot be held liable under a *Monell* theory or for his failure to intervene to prevent Plaintiffs' injuries.  Each argument fails.  *First*, no court has ever held that the mere existence of a consent decree defeats a *Monell* claim.  In numerous cases in this District and other circuits, federal courts have allowed *Monell* claims to proceed even when defendants have entered into consent decrees.  *See, e.g.*, *Fix v. City of Chicago*, Nos. 21-cv-2843 and 21-cv-2846, 2022 WL 93503, at *2–4 (N.D. Ill. Jan. 10, 2022); *Hendrick v. Bryant*, No. 20-cv-00249, 2021 WL 4502159, at *4 (N.D. Ill. Sept. 30, 2021); *Widmaier v. City of Newark*, No. 16-2533, 2019 WL 1895087, at *4 (D.N.J. Apr. 29, 2019); *Phillips v. Bratton*, No. 07-873, 2008 WL 11409876, at *2–3 (C.D. Cal. Jan. 28, 2008).  The City urges this Court to adopt a new, unprecedented rule when arguing that a consent decree allows Defendants to escape *Monell* liability even when, as is the case here, Defendants have failed almost entirely to comply with the terms of the Decree.  Put simply, Defendants argue that their promises to change have legal significance and that this Court must ignore the ongoing failure to make good on those promises. The Court should reject this argument, untethered as it is from law and common sense.  *Second*,

Superintendent Brown's attempts to avoid liability for his officers' violence and unlawful conduct during the summer of 2020 requires a misreading of Plaintiffs' complaint. In reality, Plaintiffs have pleaded facts sufficient to support all allegations against Defendant Brown. As the final policymaker for the CPD, Plaintiffs alleged that Superintendent Brown encouraged and permitted *de facto* policies and practices that resulted in his officers' abusive, violent, reactionary, and unconstitutional conduct during the summer of 2020 protests. Plaintiffs further allege that he had knowledge of the widespread abuse that occurred during each protest at the hands of his officers and that he was physically present on the streets during at least one protest. These allegations are sufficient to permit Plaintiffs' *Monell* and failure to intervene claims against Superintendent Brown to proceed.

## SUMMARY OF FACTUAL ALLEGATIONS

Plaintiffs, as well as thousands of others, engaged in a wide range of actions across the City throughout the summer of 2020 to protest racist police violence and demand substantial changes. Second Am. Compl. ¶ 2. The CPD responded to these protests with brutal, violent, and unconstitutional tactics that were clearly intended to injure, silence, and intimidate Plaintiffs and other protesters. *Id.* ¶ 3. These abusive tactics included beating and striking protesters in the head with batons; tackling and beating protesters while on the ground; spraying protesters with chemical agents; falsely arresting protesters; trapping protesters in enclosed areas; and destroying and confiscating protesters' property. *Id.* ¶¶ 3, 5.

CPD's response to the summer 2020 protests was consistent with CPD's long-standing policies and practices of using abusive tactics and excessive force against protesters seeking progressive social and political change. *Id.* ¶ 7. Dating as far back as 1877, CPD began using excessive force to quell protesters' rights and has continued using unconstitutional practices against protesters throughout history. *Id.* ¶¶ 7, 1046-1101. CPD's violence and brutality against

protesters is also consistent with CPD's widespread policy and practice of using aggressive tactics that unnecessarily escalate encounters with individuals, increase tensions, and lead to excessive force. *Id*. ¶ 1105. CPD has maintained its widespread practice of using excessive force for well over 100 years through promoting the "code of silence" and the failure to discipline Chicago police officers who engage in misconduct. *Id*. ¶ 1123. CPD's widespread practices of using excessive force and the code of silence have been documented and acknowledged by government reports, including the Chicago Police Accountability Task Force (PATF) Report and the Department of Justice (DOJ) Report, by City officials, including the Mayor and Superintendent of Police, and by the federal courts. *Id*. ¶ 1105.

CPD's systemic violations against protesters at the summer 2020 protests occurred despite the City and CPD being subject to the Consent Decree for almost two years. *Id*. ¶ 8. The Consent Decree contains a number of provisions that should have remedied the policy and practice violations that caused Plaintiffs' injuries, but CPD has entirely failed to conform its practices to Consent Decree mandates. *Id.* ¶¶ 1116, 1122.

CPD's response to the summer 2020 protests was investigated by CPD, by the Office of Inspector General for the City of Chicago, and by the Independent Monitor Team responsible for monitoring the City's compliance with the Consent Decree. *Id.* ¶¶ 1138-41. In each of the three reports documenting these investigations, key findings and admissions related to CPD's failures during the protests were made, including that: CPD and the City did not have the policies, reporting practices, and training required to respond effectively to the protests; officers engaged in various levels of misconduct and excessive force; CPD officers underreported uses of force; and CPD officer use of force was not subject to any meaningful accountability process. *Id.*

Defendant Superintendent Brown, who is responsible for the general management and control of CPD, made all command decisions about the CPD's systematic response to the summer 2020 protests and authorized and directed the officers' unlawful conduct. *Id.* ¶ 96. Superintendent Brown encouraged and permitted CPD officers to target, attack, and harass protesters with violent animus and took no action to halt CPD officers' systemic violence against the protesters. *Id.* At the August 15, 2020 protest, Superintendent Brown stood shoulder to shoulder with CPD officers who abused protesters (including five Plaintiffs). *Id.* ¶¶ 96-97, 948-1044. Superintendent Brown then attempted to justify and/or conceal his officers' unlawful conduct at the August 15, 2020 protest by making a number of false and misleading statements to the media. *Id.* ¶ 97.

In Plaintiffs' Second Amended Complaint, they allege eighteen counts against Defendants. The relevant counts at issue here are: the *Monell* claim against Defendant City of Chicago (Count X); the failure to intervene claim against Defendant Superintendent Brown (Count VIII); and the state law claims of respondeat superior and indemnification against Defendant City of Chicago (Counts XVII and XVIII).

## STANDARD OF REVIEW

"A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits." *Chatman v. City of Chicago*, No. 14 C 2945, 2015 WL 1090965, at *4 (N.D. Ill. Mar. 10, 2015). To survive a 12(b)(6) motion, a complaint must "state a claim that is plausible on its face." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Bell v. Twombly*, 550 U.S. 544, 570 (2007)). The complainant's allegations must "give the defendant fair notice of what the claim is and the grounds upon which it rests, and . . . show that it is plausible, rather than merely speculative, that he is entitled to relief." *Driscoll v. Juris Kins & Davis McGrath, L.L.C.*, No. 16 C 9359, 2017 WL 4122715, at *3 (N.D. Ill. Sept. 18, 2017)

(quoting *Tamayo v. Blagojevich*, 526 F.3d 1074, 1083 (7th Cir. 2008)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). To determine whether Plaintiffs have met this standard, the Court must "tak[e] all well-pleaded allegations of the complaint as true and view[] them in the light most favorable to the plaintiff." *Santiago v. Walls*, 599 F.3d 749, 756 (7th Cir. 2010) (quoting *Zimmerman v. Tribble*, 226 F.3d 568, 571 (7th Cir. 2000)).

**ARGUMENT**

I.    **Defendants' Motion to Dismiss Begins by Asserting Additional Facts Not Contained in Plaintiffs' Complaint Which Must be Disregarded by This Court**

After a cursory summary of Plaintiffs' claims, Defendants' brief contains a fact section entitled "Further Context for Plaintiffs' Claims." In this section, Defendants complain about facts they believe Plaintiffs omitted from their complaint, contradict facts alleged by Plaintiffs, and reframe Plaintiffs' allegations in a light most favorable to Defendants. Defs. Mot. at 8-13. This entire section is wholly inappropriate in a motion to dismiss and the Court should disregard it entirely.

When contemplating a motion to dismiss, a court must generally accept all well-pleaded factual allegations in the complaint as true. *See Iqbal*, 556 U.S. at 678; *Craftwood II, Inc. v. Generac Power Sys., Inc.*, 920 F.3d 479, 481 (7th Cir. 2019); *United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 839 (7th Cir. 2018). Because a motion to dismiss challenges the legal sufficiency of a complaint, rather than its factual content, Defendants should not "attempt[] to rebut Plaintiff[s'] . . . allegations with their own version of the facts." *Smith v. Burge*, 222 F. Supp. 3d 669, 691 (N.D. Ill. 2016); *see also United States v. LaSalle Bank, N.A.*, No. 07 C 6196, 2008 WL 4874169, at *2 (N.D. Ill. July 29, 2008) (courts "should not attempt to

resolve factual disputes on a motion to dismiss"). The question asked is not whether the facts alleged are true, but rather whether the facts alleged, if true, would give rise to a legal claim.

Many of the disputed facts included in this section are Defendants' re-casting of facts alleged by Plaintiffs. For example, while Plaintiffs refer to the Monitor's Reports to support their *Monell* allegations, *see* Second Am. Compl. ¶¶ 1117–20 (summarizing the Monitor's biannual reports that described CPD's failure to meet compliance standards and missed deadlines), Defendants refer to those same reports to argue that Plaintiffs' *Monell* allegations cannot survive a motion to dismiss, *see* Defs. Mot. at 12 (noting that the most recent Monitor's report "lauded" the reform efforts of City personnel). This is a classic factual dispute that simply cannot be resolved at this stage of the litigation. Defendants' assertions in this section serve only to introduce disputed matters of fact, which must be resolved in Plaintiffs' favor at this stage of the proceedings.

In some instances, Defendants argue facts that are not included in Plaintiffs' complaint, and incorporate media accounts Plaintiffs do not reference. Defs. Mot at 7, 9 n.6. For example, Defendants complain that Plaintiffs' complaint fails to convey the "unprecedented" and "record breaking" scale of the protests that occurred during the summer of 2020, and asserts that Chicago experienced "unprecedented levels of civil unrest, looting and destruction of property." Defs. Mot. at 8–9. Defendants here attempt to imply that Plaintiffs were involved in unlawful and/or violent conduct, an assertion that directly conflicts with Plaintiffs' allegations. *See* Second Am. Compl. ¶¶ 105–06; 121–22, 136–37, 147–48, 163–64, 175–76, 184–85, 190–91, 201–02, 207–08, 218–19, 234–35, 254–55, 262–63, 278–79, 286–87, 296–97, 308–09, 322–23, 332–33, 342–43, 351–52, 365–66, 380–81, 392–23, 408–09, 428–29, 441–42, 453–54, 469–70, 483–84, 503–04, 522–23, 538–39, 557–58, 570–71, 583–83, 598–99, 610–11, 623–24, 632–33, 651–52, 668–

69, 680–81, 696–97, 710–11, 733–34, 748–49, 758–59, 771–72, 782–83, 793–94, 814–15, 831–31, 843–44, 858–59, 873–74, 893–94, 909–910, 926–27, 945–46, 959–60, 980–81, 997–98, 1023–24, 1042–43 (paragraphs alleging that the Plaintiffs did not attack, assault, threaten, or resist CPD officers, and that the Plaintiffs did not engage in any unlawful activity and were engaging in constitutionally protected activity); *see also id.* ¶ 1140 (v) (alleging that on May 30, 2020, Mayor Lightfoot authorized the use of O.C. spray on peaceful protesters at Trump Tower); *id.* (vi) (alleging that CPD officers reported using O.C. spray on peaceful protesters); *id.* (ix) ("The OIG Protest Report . . . documents that 'protesters reported . . . seeing CPD members tackle, punch and use batons to strike peaceful protesters in the head and neck.'"); *id.* ¶ 1141 (iii) ("The IMT Protest Report documented that 'some officers engaged in various levels of misconduct and excessive force.'"); *id.* (iv)(b) (describing an officer tackling a person merely observing the protests); *id.* (e) (describing CPD officers denying water to an arrested, pregnant, Black protester and mocking her for the request); *id.* (h) (noting that the IMT described CPD officers as engaging in obviously escalatory behavior).

Defendants also attempt to criticize Plaintiffs for failing to adequately plead facts related to the COVID-19 pandemic and the high rate of infection among CPD officers.[1] Defendants

---

[1] Interestingly, here Defendants omit mention of many CPD members' well documented refusal to adhere to COVID-19 protections. *See* Kelly Bauer, Chicago Cops Haven't Been Wearing Masks For Months, But Lightfoot Vows To Crack Down, Block Club Chicago (October 22, 2020), https://blockclubchicago.org/2020/10/22/chicago-cops-havent-been-wearing-masks-for-months-but-lightfoot-vows-to-crack-down/ ("[O]fficers have frequently been seen and photographed throughout the coronavirus crisis without masks or other safety measures."); Fran Spielman and Mitch Dudek, Compliance with COVID-19 vaccine mandate for city workers worst among police, firefighters, Chicago Sun Times (October 18, 2021), https://chicago.suntimes.com/city-hall/2021/10/18/22733248/chicago-police-coronavirus-covid-vaccine-mandate-city-employees-compliance-rates-lightfoot-catanzara (FOP president "has urged his members not to report their vaccination status to the city and, instead, file forms exempting them from the vaccine."); Heather Cheron, 62% of Chicago Police Officers Say They're Vaccinated Against COVID-19 – A Month After Reporting Deadline, WTTW (November 15, 2021), https://news.wttw.com/2021/11/15/62-chicago-police-officers-say-they-re- vaccinated-against-covid-19-month-after-reporting (Noting that "The Chicago Police Department continues to have the lowest rate of compliance with the city's vaccine reporting mandate of all of the city departments.").

argue that COVID-19 "presented 'extraordinary challenges' to the Department's efforts to respond to the unprecedented level of protest and unrest that the City experienced last summer." Defs. Mot. at 10. Again, Defendants' attempts to recast Plaintiffs' facts in the light most favorable to them ignores the procedural posture of this case and must be disregarded by this Court. *See Craftwood II, Inc.*, 920 F.3d at 481. In attempting to introduce pandemic-related facts, Defendants ignore both basic civil procedure and a recent mandate from the Seventh Circuit warning that "[g]overnment officials in our country are bound by constitutional requirements even when they are dealing with difficult and unfamiliar challenges to public health and safety." *Mays v. Dart*, 453 F. Supp. 3d 1074, 1084 (N.D. Ill. 2020), *aff'd in relevant part*, 974 F.3d 810 (7th Cir. 2020); *see also Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020) (with respect to the First Amendment, "even in a pandemic, the Constitution cannot be put away and forgotten."). Defendants cannot plead the pandemic as an affirmative defense or assert at this stage of the proceedings that pandemic-related challenges gave CPD license to trample the constitutional rights of protesters.[2]

Defendants also attempt to recast the Consent Decree-related facts alleged in Plaintiffs' complaint—they provide a sterilized and white-washed retelling of the Decree's origin story and fail to fully describe the City's widespread failure to comply with the Decree's mandates.

---

[2] In *In re New York City During Summer 2020 Demonstrations*, No. 20-cv-8924, 2021 WL 2894764, at *10 (S.D.N.Y. July 9, 2021), the New York City police department tried—and failed—to make an identical argument. There, the court considered whether the COVID-19 pandemic was relevant to litigation in which protesters sued the NYPD for its response to the 2020 uprisings in New York. *Id.* After comparing the NYPD's response in 2020 to its response to other protests over the last twenty years, the court concluded that the NYPD's invocation of the pandemic at the motion to dismiss stage was a "total red herring," particularly because the plaintiffs there alleged "the existence of a decades-old problem, one that existed prior to the pandemic and that was allegedly dealt with in the same way before and during the pandemic." *Id.* Likewise, Plaintiffs here allege the existence of problems within CPD that stretch back over a century and continued throughout the pandemic. Second Am. Compl. ¶¶ 1046–101.

Defendants assert that the Consent Decree's "procedural history" provides important context for the City's protest response. Defs. Mot. at 10. Defendants' Consent Decree-related "context" ignores the Plaintiffs' following Consent Decree-related allegations:

- The Consent Decree is grounded in findings the U.S. Department of Justice (DOJ) and the Police Accountability Task Force (PATF) made about CPD's widespread, violent, and discriminatory policies and practices after launching detailed investigations. The DOJ and PATF investigations resulted from the uprisings that occurred in the aftermath of the 2015 release of the video depicting CPD Officer Jason Van Dyke murder Black teenager Laquan McDonald and the resulting cover-up. Some of the groups that provided foundation, leadership, and support for these uprisings, including Black Lives Matter-Chicago, filed a lawsuit seeking a consent decree that would govern CPD operations and prevent future abuse and racialized violence and won the right to enforce the Consent Decree that ultimately resulted from litigation filed by the Illinois Attorney General. Second Am. Compl. ¶¶ 1105-16.
- The Consent Decree entirely failed to create any meaningful change within the CPD in part because the CPD consistently missed consent decree related deadlines. *Id.* ¶ 8.
- CPD continued to engage in these abus(sive) and unconstitutional tactics despite being under a Consent Decree. *Id.* ¶ 1101.
- The Consent Decree should have remedied the policy and practice violations described in Plaintiff's complaint, but CPD failed to conform its practices to Consent Decree mandates. *Id.* ¶ 1116.
- The Consent Decree's Independent Monitor found that as of June 2020, the CPD missed 52 of 74 Consent Decree deadlines and failed to meet compliance goals for the majority of Consent Decree provisions. *Id.* ¶¶ 1117-22.
- The Consent Decree contained protections that were intended to protect Plaintiffs but were not meaningfully implemented by Defendants. *Id.* ¶ 1122.

Clearly, the Parties have significant factual disagreements regarding the significance of the Consent Decree to Plaintiffs' *Monell* claims. At this stage of the litigation, all such disagreements must be resolved in favor of Plaintiffs. Thus, the Court must ignore Defendants' incomplete rendering of the Consent Decree process. *See Fix*, 2022 WL 93503, at *3 ("The City's argument seeks to refute plaintiffs' allegations instead of challenging their sufficiency," and "[i]t is well-settled that a defendant cannot, in presenting its 12(b)(6) challenge, attempt to refute the complaint or to present a different set of allegations." (citation and internal quotation

marks omitted)).  And to the extent that Defendants' argument here rests on their assertions that the Consent Decree has actually produced change in CPD operations—that is a factual dispute irrelevant to the Court at this stage of the proceedings.  *See Dolson v. Vill. of Washingtonville*, 382 F. Supp. 2d 598, 602 (S.D.N.Y. 2005) ("Defendant's version of events . . . is utterly irrelevant at this point in the lawsuit.").

Finally, Defendants attempt to describe their efforts to revise policy and practices after Plaintiffs were injured by CPD.  Defs. Mot. at 13.  Like each of the foregoing factual assertions, Defendants' subsequent remedial measures are not relevant to Plaintiffs' damages claims at this early stage—except that they demonstrate that Defendants had significant alternatives they could have employed short of brutalizing the protesters and otherwise violating their rights.  *See Robernhorst v. Dematic Corp.*, No. 05 C 3192, 2008 WL 1821519, at *6 (N.D. Ill. Apr. 22, 2008) (holding that a plaintiff could introduce evidence of subsequent remedial measures in the event the defendants contest their feasibility); *McGaughey v. City of Chicago*, No. 84 C 10546, 1987 WL 12213 (N.D. Ill. June 9, 1987) (finding that the evidence of CPD's new fingerprinting policy was "relevant to rebut a claim that no remedial measure was feasible, or that a measure similar to [the new policy]—which required watch commanders to waive fingerprint results in misdemeanor arrests—was not feasible" and thus was "admissible for the limited purposes of rebuttal").

## II.   Plaintiffs Have Properly Alleged a *Monell* Claim Against the City of Chicago and Superintendent Brown (Count X)

Defendants seek dismissal of Count X, contending that Plaintiffs have failed to plausibly allege that unlawful policies and practices implemented by the City or Superintendent Brown proximately caused Plaintiffs' injuries.  Def. Mot. at 14–23.  Defendants' argument lacks merit.

To state a Section 1983 claim against the City and Superintendent Brown in his official capacity under *Monell*, Plaintiffs must allege that they suffered injuries caused by the Chicago Police Department's official policies or customs. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Estate of Sims ex rel. Sims v. Cty. of Bureau*, 506 F.3d 509, 515 (7th Cir. 2007). Plaintiffs can demonstrate an official policy or custom in three ways: (1) by establishing the existence of an express policy that causes a constitutional deprivation when enforced; (2) by establishing the existence of a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) by showing that the constitutional injury was caused by a person with final policymaking authority. *Estate of Sims*, 506 F.3d at 515. Additionally, to demonstrate that the City is liable for a harmful practice or custom, Plaintiffs must show that the City's policymakers were "deliberately indifferent as to the known or obvious consequences." *Thomas v. Cook Cty. Sheriff's* Dep't, 604 F.3d 293, 303 (7th Cir. 2010) (quoting *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002)). In other words, Plaintiffs must show that the City "must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect [Plaintiffs]." *Id.*

### A. Plaintiffs have properly alleged that CPD's widespread practices caused their injuries and that the City and Superintendent Brown were deliberately indifferent

The Seventh Circuit has not adopted any "bright-line rules defining a 'widespread custom or practice.'" *Thomas*, 604 F.3d at 303. There is no clear consensus as to how frequently such conduct must occur, except that it must be more than three instances. *Id.* Plaintiffs may demonstrate a widespread practice by alleging "a series of violations to lay the premise of deliberate indifference." *Id.* (internal citations and quotation marks omitted). In "widespread practice" implicit policy cases, "what is needed is evidence that there is a true municipal policy

at issue, not a random event.  If the same problem has arisen many times and the municipality has acquiesced in the outcome, it is possible (though not necessary) to infer that there is a policy at work, not [a] isolated incident." *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005).

Plaintiffs more than meet their burden here by alleging a pattern of *de facto* policies that stretches back over a century, relying on government reports and investigations to support allegations of ongoing widespread constitutional violations and to bolster allegations that Defendants have been deliberately indifferent to the harms caused by CPD's deficient policies.

### i. Plaintiffs alleged that CPD has a long history of widespread policy and practice failures

Plaintiffs allege that CPD has a long history of using unreasonable force and false arrests to quell protests.  Second Am. Compl. ¶¶ 7, 1046–1101.  Specifically, Plaintiffs provide a detailed account of instances where CPD used excessive force and false arrests against protesters starting with the 1877 labor reform protests and continuing throughout history, including through the 1919 race riots, the 1968 Democratic National Convention, the 1977 marches against housing discrimination, the 1990 Gulf War protests, the 1990s and early 2000s demonstrations in support of people with HIV/AIDS and against governmental indifference led by ACT-UP and others, the 2003 mass anti-Iraq War demonstration, and the 2016 counter demonstration to the Presidential candidate Trump's scheduled rally at UIC.  *Id.*

Courts have regularly found that such historical context supports allegations of a widespread practice and can provide evidence of deliberate indifference.  For example, recently, a court in this District relied on allegations in the plaintiff's complaint dating back to 1959 regarding instances of coerced confessions and fabrication of evidence to deny the defendants' motion to dismiss plaintiff's *Monell* claim against the Peoria Police Department.  *Savory v. Cannon*, 532 F. Supp. 3d 628, 639–40 (N.D. Ill. 2021); *Savory v. Cannon*, 17-cv-0204 (N.D. Ill.)

Compl. ¶ 128 (Dkt. No. 1). In another case in this District, the court denied a motion to dismiss when a plaintiff relied on evidence from 1978—twenty-seven years before the allegations in the complaint—to buttress *Monell* claims against the Cook County Sheriff's Department for a practice of suppressing and manufacturing evidence. *Hill v. Cook County*, 463 F. Supp. 3d 820, 843 (N.D. Ill. 2020); *Hill v. Cook County*, 18-cv-08228 (N.D. Ill.) First Amend. Compl. at ¶ 55 (Dkt. No. 50); *see also Vega v. Chicago Park District*, 954 F.3d 996, 1011 (7th Cir. 2020) (considering evidence from fifteen years prior to the suit related to a *Monell* claim alleging widespread discrimination); *In re New York City During Summer 2020 Demonstrations*, No. 20-cv-8924, 2021 WL 2894764, at *9 (S.D.N.Y. July 9, 2021) ("Plaintiffs identify a number of police practices that were allegedly wrongfully used or abused during the BLM protests and pleads facts from which it could be inferred that this was not some 'one off' instance of misuse of these practices, but had been part and parcel of the NYPD's 'arsenal' for dealing with political protests for that past two decades. That sufficiently pleads a custom or policy of using excessive force and making false arrests at large protests throughout New York City."); *cf. Keyes v. School Dist. No. 1*, 413 U.S. 189, 198–99 (1973) (referencing almost ten years of a school district's history of segregation to affirm findings that the district engaged in a pattern and practice of unlawful segregation); *EEOC v. Chicago Miniature Lamp Works*, 622 F. Supp. 1281, 1295 (N.D. Ill. 1985) (relying on twelve years of employment discrimination data); *E.E.O.C. v. O & G Spring and Wire Forms Specialty Co.*, 705 F. Supp. 400, 402–03 (N.D. Ill. 1988), *aff'd* 38 F.3d 872 (7th Cir. 1994) (reviewing over seventeen years of evidence of an employer's history of racial discrimination).

CPD's history of brutalizing protesters helps demonstrate Defendants' deliberate indifference to CPD's pattern and practice of constitutional violations. Courts have long agreed

that prior acts are helpful to determine intent for the act in question. *See, e.g.*, *Keyes*, 413 U.S. at 207 ("[T]he prior doing of other similar acts, whether clearly a part of a scheme or not, is useful as reducing the possibility that the act in question was done with innocent intent." (quoting 2 J. Wigmore, Evidence 200 (3d ed. 1940))). Plaintiffs' allegations of CPD's unlawful behavior at protests throughout history, and the years of litigation and investigations after these protests, demonstrates that the City and Superintendent Brown were on notice that CPD officers time and again abuse protesters and violate Chicagoans' constitutional rights. Like the 1968 Commission reported, "[i]t is a kind of Alice in Wonderland with the same moving picture re-shown over and over again, the same analysis, the same recommendations, the same inactions." Second Am. Compl. ¶ 1071. Defendants' refusal to learn from their past re-creates history and dooms protesters to live with a violent and unlawful police force. This is the very essence of deliberate indifference. *See J.K.J. v. Polk County*, 960 F.3d 367, 378 (7th Cir. 2020) ("The Supreme Court has recognized that *Monell* liability can arise from [a defendants' failure to act] because a "city's 'policy of inaction' in light of notice that its program will cause constitutional violations 'is the functional equivalent of a decision by the city itself to violate the Constitution.'" (quoting *Connick v. Thompson*, 563 U.S. 51, 61-62 (2011)).

### ii. Plaintiffs allege that various government reports and protest-related after action reports support their *Monell* allegations

Plaintiffs also allege that CPD's violence against protesters is an extension of CPD's long standing, widespread practice of using excessive force, which has been documented by government reports, including the Chicago Police Accountability Task Force (PATF) Report and the Department of Justice (DOJ) Report. Second Am. Compl. ¶ 1105. The 2016 PATF Report concluded that "data establishes that CPD's use of force disproportionately affects people of color." *Id.* ¶ 1107. After a two year investigation, the DOJ concluded in its 2017 Report that

"CPD officers engage in a pattern or practice of using force that is unjustified, disproportionate, and otherwise excessive." *Id.* ¶¶ 1108–09.

Plaintiffs additionally allege that a widespread code of silence and failure to investigate, discipline, and supervise abusive officers pervades the CPD and allows for the constitutional violations against protesters to continue. *Id.* ¶¶ 1123–34. In further support, Plaintiffs allege that the PATF found that the code of silence is institutionalized and reinforced by CPD rules and policies that are also baked into the labor agreements between the various police unions and the City, and that the DOJ investigation confirmed that police officers and leadership within CPD and its union acknowledge that a code of silence among officers exists. *Id.* ¶¶ 1127–28. Plaintiffs also allege that according to the Citizens Police Data Project, between 1988 and 2020, only 3% of all complaints that CPD officers engaged in excessive force resulted in any discipline for the officer and only 1% of complaints related to First Amendment violations resulted in discipline. *Id.* ¶ 1131.

Further, Plaintiffs thoroughly detail how these widespread practices within CPD were the direct and proximate cause of Plaintiffs' injuries (and other protesters' injuries) during the 2020 summer protests. *Id.* ¶¶ 7, 1045, 1138–41. Plaintiffs allege that CPD's After Action Report, released in February 2021, makes a number of key admissions about its failed response to the 2020 protests, including, *inter alia*, that CPD officers were not prepared to respond to large-scale incidents and that CPD officers failed to comply with existing policies regarding mass arrests. *Id.* ¶ 1138. Plaintiffs allege that the February 2021 Office of the Inspector General for the City of Chicago (OIG) Report on the summer protests made a number of findings, including, *inter alia*, that: CPD failed to train officers on mass arrest procedures; the Mayor and Superintendent Brown authorized the use of O.C. spray in situations involving large crowds; CPD officers used

excessive force; CPD officers underreported uses of force; and CPD officer use of force was not subject to any meaningful accountability process.  *Id.* ¶ 1140.  Plaintiff also alleges that the Independent Monitor Team (IMT) responsible for monitoring the City's compliance with the Consent Decree issued a report in July 2021 concluding, *inter alia*, that CPD and the City did not have the policies, reporting practices, and training required to respond effectively to the protests, and that some officers engaged in various levels of misconduct and excessive force.  *Id.* ¶ 1141.

Plaintiffs' allegations support a reasonable inference that the City and its policymakers, including Superintendent Brown, were deliberately indifferent to the constitutional violations caused by CPD's widespread practices.  It is reasonable to infer from Plaintiffs' allegations that the City had notice of the constitutional violations committed by CPD throughout the years, and nonetheless failed to take appropriate action to deter unconstitutional conduct at the protests during the summer of 2020.  Plaintiffs allege that CPD's widespread practice of using excessive force has been documented and acknowledged by the DOJ, the PATF, the federal courts, civil rights activists, City officials—including the Mayor and Superintendent of Police—and, above all, by the Black communities most targeted by CPD for violence and abuse.  *Id.* ¶ 1105. Plaintiffs allege that the code of silence within CPD, which directly contributes to officers abusing protesters with impunity, has been recognized by former City of Chicago Mayor Rahm Emanuel, the PATF, the DOJ, a federal jury, and CPD officers and leadership.  *Id.* ¶¶ 1125–29. Plaintiffs also allege that the DOJ Report—which included findings related to the accountability body charged with overseeing officers—concluded that in the rare instance where a complaint of misconduct against an officer is sustained, discipline is haphazard and unpredictable, and is meted out in a way that does little to deter misconduct.  *Id.* ¶¶ 1108, 1131.  Moreover, the City's awareness of CPD's widespread unconstitutional practices and failure to rectify them is

evidenced by its defiance of the Consent Decree. Plaintiffs allege that even though the Consent

Decree contains a number of provisions that should have remedied the policy and practice

violations that caused Plaintiffs' injuries, CPD has entirely failed to confirm its practices to

Consent Decree mandates. *Id.* ¶¶ 1116, 1122. Plaintiffs allege that the City and CPD have

failed to comply with the reform schedule outlined in the Consent Decree—the IMT reported in

their first report that the City and CPD missed 37 of 50 deadlines, and reported in their second

report filed on June 18, 2020, that the City and CPD missed 52 of 74 deadlines. *Id.* ¶¶ 1116–17.

Specifically regarding the Consent Decree's provisions concerning use of force, CPD missed 16

out of 19 deadlines. *Id.* ¶ 1120.

  Plaintiffs' allegations are more than sufficient to state a *Monell* claim. In fact, in two

cases recently brought by protesters who were abused by CPD officers during the 2020 summer

protests, the court issued an opinion denying the City's motion to dismiss the plaintiffs' *Monell*

claim, which was supported by substantially similar factual allegations to those alleged here.

*Fix*, 2022 WL 93503, at *1. In *Fix*, the court found that the plaintiffs' allegations detailing not

only the excessive force they experienced, but also the CPD's historic failures in this respect—as

demonstrated by CPD's prior use of excessive force in the context of protests and

demonstrations, and similar incidents discussed in the Consent Decree, the DOJ Report, and the

PATF Report—were sufficient to plead a *Monell* claim based on the City's deliberate

indifference to CPD's widespread practices. *Id.* at *2–4. Moreover, courts have consistently

allowed plaintiffs' *Monell* claims to proceed past the motion to dismiss stage based on less

detailed factual allegations than Plaintiffs'. *See, e.g.*, *Flores Delgado v. City of Chicago*, No. 18-

cv-06378, 2021 WL 2784304, at *5 (N.D. Ill. July 2, 2021) (finding that "allegations regarding

the number of excessive force complaints investigated, the number found to have merit, and

examples of the City failing to investigate or otherwise condoning officers' use of deadly force" were sufficient to state a *Monell* claim based on the failure of CPD to properly and legitimately investigate the use of deadly force by officers); *Archie v. City of Chicago*, No. 19 CV 4838, 2020 WL 5751185, at *3 (N.D. Ill. Sept. 25, 2020) (allowing *Monell* claim to proceed because it was "reasonable to infer from DOJ report's findings—and from plaintiffs' allegations that—the Chicago police officers have a widespread practice of using excessive force against children in all sorts of contexts" and that "the City is deliberately indifferent to these constitutional violations"); *Mendez v. City of Chicago*, No. 18 C 6313, 2019 WL 4934698, at *3 (N.D. Ill. Oct. 7, 2019) (finding that plaintiff alleged sufficient facts to state a Monell claim where plaintiff alleged that the City's practice of foot pursuits raises the risk of excessive force and cited to the DOJ report in support); *Shields v. City of Chicago*, No. 17 C 6689, 2018 WL 1138553, at *4 (N.D. Ill. March 2, 2018) (holding that plaintiff sufficiently stated a *Monell* claim where he alleged that the PATF Report and January 2017 DOJ Report "highlight the deficiencies in relation to CPD's use of excessive force that are sufficiently similar to Plaintiff's excessive force allegations—raising a reasonable inference that he is not alone in suffering constitutional injuries resulting from this alleged practice or custom"); *Hill v. City of Harvey*, 17 C 4699, 2018 WL 278720, at *5 (N.D. Ill. Jan. 3, 2018) (finding that general claims of widespread practices, combined with specific allegations of wrongful conduct by officers against plaintiff, were adequate to state a *Monell* claim); *Spearman v. Elizondo*, 230 F. Supp. 3d 888, 893-94 (N.D. Ill. 2016) (finding that allegations of civil complaints against officers, jury verdict on the code of silence, statements by former Chicago Mayor Emmanuel, and statements of convicted officers were sufficient to state a *Monell* claim); *Howard v. Sheriff of Cook County,* No. 15 C 9384, 2016 WL 4366598, at *3–4 (N.D. Ill. Aug. 16, 2016) (finding that plaintiff's *Monell* allegations

supported by a 2010 consent decree, while conclusory, were plausible and sufficient to put the

Cook County Sheriff on notice of plaintiff's claim against it); *Smith v. City of Chicago*, 143 F.

Supp. 3d 741, 753 (N.D. Ill. 2015) (finding that plaintiffs "alleged enough factual details

regarding their failure to train claim under the federal pleading standards, [and] they have alleged

sufficient facts that the City and Defendant McCarthy acted with deliberate indifference");

*LaPorta v. City of Chicago*, 102 F. Supp. 3d 1014, 1021 (N.D. Ill. 2015) (rejecting the City's

arguments that plaintiff's allegations were "too conclusory and speculative to survive a motion to

dismiss" and finding that plaintiff has plausibly alleged a widespread practice of "failing to

investigate, discipline, or otherwise hold accountable its police officers"); *Riley v. Cty. of Cook*,

682 F. Supp. 2d 856, 861 (N.D. Ill. 2010) ("[A]n official capacity claim can survive even with

conclusory allegations that a policy or practice existed, so long as facts are pled that put the

defendants on proper notice of the alleged wrongdoing."); *Sanders v. Sheehan*, No. 09 C 7707,

2010 WL 2990121, at *3–5 (N.D. Ill. July 26, 2010) (denying motion to dismiss *Monell* claim

where plaintiff's conclusory allegations were "sufficient to give the City notice of the specific

policies against which it must defend").

### iii. Contrary to Defendants' arguments, the existence of the Consent Decree and Defendants' Decree violations support Plaintiffs' *Monell* claims

Defendants attempt to defeat Plaintiffs' *Monell* claim by arguing that "the Consent

Decree's very existence demonstrates the City's deliberate intention to reform and improve

policing practice." Defs. Mot. at 21. Defendants claim that because the City of Chicago

voluntarily entered into the CPD Consent Decree, they cannot be found to be deliberately

indifferent to the risk of harm posed by CPD's unconstitutional policies and practices. *Id.* at 18.

Defendants contend that "[t]he City's ongoing efforts to reform the Department's policies and

practices through the Consent Decree demonstrate a deliberate intention to *remedy* the kinds of

violations Plaintiffs allege, not a deliberate indifference to such violations." *Id.* But this is not the law. To the contrary, the Consent Decree (and the City's failure to comply with the vast majority of its provisions) are powerful evidence that the City has long been on notice regarding CPD's policy and practice failures and has failed to take action to remedy these violations. Second Am. Compl. ¶¶ 1117-22. The City argues that merely because it has paid lip service to an "ongoing commitment to police reform," it cannot be found deliberately indifferent to the harm Plaintiffs' suffered as a result of CPD's policies and practices. Defs. Mot. at 20. In doing so, the City urges this Court to adopt a new rule—in violation of decades of precedent which have allowed *Monell* claims to proceed during the pendency of a consent decree. *See, e.g.*, *Howard*, 2016 WL 4366598, at *4 (*Monell* claim while Cook County Jail consent decree in effect); *Widmaier*, 2019 WL 1895087, at *4 (*Monell* claim while Newark Police Department consent decree in effect); *Phillips*, 2008 WL 11409876, at *2–3 (*Monell* claim while Los Angeles Police Department consent decree in effect); *Bennett v. Serpas*, No. 15-3087, 2017 WL 2778109, at *2 (E.D. La. June 26, 2017) (*Monell* claim while New Orleans Police Department consent decree in effect). This Court should decline the City's invitation to do so and rule in accordance with long established case law. *See Fix*, 2022 WL 93503, at *2–4; *Hendrick*, 2021 WL 4502159, at *4.

In any event, Defendants' misplaced belief that the existence of the Consent Decree defeats an inference of deliberate indifference is unavailing. Plaintiffs allege that CPD's widespread unconstitutional practices continue to occur despite the City and CPD being subject to a Consent Decree for almost two years. Second Am. Compl. ¶ 8. Plaintiffs allege that the City's missed deadlines and non-compliance with the Consent Decree bore directly on CPD's civil rights abuses at the summer 2020 protests—Plaintiffs allege that CPD failed to create

adequate policies and procedures for use of force, impartial policing, and crisis intervention and failed to revise relevant use of force and accountability policies. *Id.* ¶ 1118. Plaintiffs allege that CPD's documented failure to comply with the Consent Decree deadlines coupled with its illegal and violent response to the summer 2020 protests demonstrate that the Consent Decree has entirely failed to create any meaningful change in CPD. *Id.* ¶ 8. Therefore, based on Plaintiffs' allegations, it is reasonable to infer that any supposed efforts by the City to reform and improve policing practices in accordance with the Consent Decree do not in fact demonstrate a deliberate intention to remedy the kinds of violations Plaintiffs allege, but instead demonstrate a deliberate indifference to such violations because the City eschewed its obligations under the Consent Decree and continued its unconstitutional practices. In *Fix*, the City similarly argued that CPD's efforts to reform—including by establishing COPA—defeated an inference of deliberate indifference, and the court rejected this argument, finding that "[b]ecause Chicago Police Officers have continued to use excessive force, even after the City's efforts to remedy the situation, there is a reasonable inference that the City's actions to combat this unlawful conduct have been inadequate." *Fix*, 2022 WL 93503, at *3. As in *Fix*, Plaintiffs here allege ongoing, systemic harms that persisted even in the face of Defendants' promises to "reform" the CPD. No case law supports the contention that a defendants' promise to change can defeat a *Monell* claim.

Defendants argue that *Monell* claims are "less plausible" as a result of the Consent Decree because "the City has made a voluntary but binding commitment to undertake an expensive and years-long process of police reform." Defs. Mot. at 18. Defendants' reliance on the Consent Decree is misplaced, as the mere existence of the Decree is not, in and of itself, evidence of a remedy or reform. The City would have to *actually comply* with the terms of the Consent Decree and implement substantive reforms to correct its unconstitutional conduct—and

the status of the City's compliance is a matter of factual dispute as explained more fully above. As noted by Judge Dow in his order approving the Decree:

> The consent decree is not a panacea, nor is it a magic wand. Most notably, there is neither an admission of liability by the City, CPD, or any other entity, nor any finding by the Court of any unconstitutional, illegal, or otherwise improper activity or conduct. As a consequence, the Court's ongoing authority lies largely in contract enforcement rather than in fashioning remedies for violations of federal law.

*Illinois v. Chicago*, 17-cv-6260 (N.D. Ill.) (Dkt. No. 702).

Despite Judge Dow's warnings to the contrary, implicit in Defendants' arguments is the assertion that the Consent Decree is indeed a magic wand that erases the City's *Monell* liability. The Consent Decree can do no such thing (particularly at this stage of litigation) because Plaintiffs have alleged that the Decree represents Defendants' broken promises and is, to use the words of Judge Dow, a breached contract. Second Am. Compl. ¶¶ 1117–22.

Moreover, other courts in this District have recognized that the CPD Consent Decree supported plaintiffs' *Monell* claims. *See, e.g.*, *Hendrick*, 2021 WL 4502159, at \*4 (finding that plaintiff sufficiently pleaded a *Monell* claim where he alleged that "the City, under the consent decree, was required to clarify in its policy on when it is appropriate for police officers to point a gun at people, to train its officers regarding that policy, and to ensure that such actions are documented," and that the City was ordered to implement those reforms months before officers stopped him and pointed their weapon at him and failed to do so); *Mendez*, 2019 WL 4934698, at \*3 (finding that plaintiff plausibly alleged a *Monell* claim where plaintiff cited to the Consent Decree, the PATF Report, and the DOJ Report as evidence that the City engaged in a practice of sanctioning uses of force during foot pursuits).

Defendants argue that case law supports their contention that the existence of the Consent Decree defeats the *Monell* claims here. Defs. Mot. at 18–20. But *no* Court has ever made such a

ruling. Defendants assert that the court in *Taylor v. City of Chicago*, "rejected claims nearly identical to those Plaintiffs raise here." Defs. Mot. at 18. However, Defendants wholly misrepresent the holding in *Taylor*. There, the Court noted that government reports—including the DOJ Report and the Independent Monitoring Report on the Consent Decree—could "buttress a *Monell* claim." *Taylor v. City of Chicago*, No. 21 C 2197, 2021 WL 4523203, at *2 (N.D. Ill. Oct. 4, 2021). But the plaintiff in *Taylor* did not refer to the DOJ Report or the Monitoring Report in the complaint. Instead, the *Taylor* plaintiff cited these reports for the first time in his response brief to the City's motion to dismiss. *Id.* And the court refused to take these reports into account because the reports did not supplement existing allegations in the complaint. *Id.* The court stated that "[w]ithout anything in the complaint to suggest that the practices found by DOJ investigators were still in pace two years later, the report is a non sequitur" and the Independent Monitoring Report "adds nothing to [plaintiff's] existing allegations." *Id.* at *3. The court therefore found that plaintiff's conclusory allegations in the complaint failed to demonstrate a custom or practice, or show that the custom or practice was the result of City officials' deliberate indifference and the cause of his injuries. *Id.* at *3–4. In contrast, here, Plaintiffs' complaint cites to a number of government reports to supplement their detailed factual allegations and buttress their claim that the City is aware of CPD's unlawful practices and acted deliberately indifferent towards constitutional violations during the 2020 protests.

Defendants' reliance on *Anderson v. Allen* is also misplaced. Defs. Mot. at 19. Again, Defendants misrepresent the holding in *Anderson*. In that case, the plaintiff's *Monell* claim alleged that he was injured by CPD's custom or practice of unconstitutional arrests that disproportionately impacts African Americans, and relied on reports detailing racially disproportionate *Terry* stops. *Anderson v. Allen*, No. 19-cv-2311, 2020 WL 5891406, at *3 (N.D

Ill. Oct. 5, 2020). In evaluating the plaintiff's allegations, the court noted "a subtle yet critical nuance" that "the cited reports focus on unconstitutional *Terry* investigatory police stops while Anderson's allegations are premised on a false arrest." *Id.* The court therefore dismissed the plaintiff's *Monell* claim because the complaint did not allege "enough factual content to allow us to draw a plausible inference that the City's practice of investigatory stops (as described in the Judge Keys/ACLU reports) was the moving force behind Anderson's constitutional injury of a false arrest." *Id.* at *4. Here, conversely, Plaintiffs refer to provisions in several government reports that directly relate to and support their allegations of CPD's unconstitutional widespread practices that caused their injuries during the summer 2020 protests.[3]

Accordingly, Plaintiffs' *Monell* claim against the City and Superintendent Brown should not be dismissed because Plaintiffs have sufficiently alleged that the City and Brown were deliberately indifferent to the widespread unconstitutional practices within CPD that caused Plaintiff's injuries.

### B. Plaintiffs have properly alleged a theory of *Monell* liability based on the actions of Superintendent Brown as a final policymaker

Another avenue for Plaintiffs to demonstrate an official policy or custom to establish municipal liability is by showing that Plaintiffs' constitutional injuries were caused by a person with final policymaking authority. *Estate of Sims*, 506 F.3d at 515; *see also McMillian v.*

---

[3] Defendants cite a few other district court decisions dismissing *Monell* claims, but those cases are inapposite for a variety of reasons. *See, e.g.*, *Czosnyka v. Gardiner*, 21-CV-3240, 2021 WL 4951517, at *2 (N.D. Ill. Oct. 25, 2021) (dismissing the plaintiffs' *Monell* claim because plaintiffs did not have Article III standing to bring this lawsuit against the City); *Carmona v. City of Chicago*, 15-CV-00462, 2018 WL 1468995, at *4 (N.D. Ill. Mar. 26, 2018) (granting the City's motion to dismiss the plaintiff's *Monell* claim because the plaintiff's allegations were bare and conclusory and he did not allege how the deficiencies described in the DOJ report—which he simply attached to his response brief and did not reference in his complaint—related to his claim that police officers illegally handcuffed and interrogated him in a hospital bed and arrested him without probable cause); *Sanchez v. Garcia*, 12 C 06347, 2015 WL 2097606, at *4 (N.D. Ill. May 4, 2015) (dismissing plaintiff's *Monell* claim at the summary judgment stage).

*Monroe Cty., Ala.*, 520 U.S. 781, 785 (1997) ("A court's task is to identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue"); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) ("[M]unicipal liability under § 1983 attaches where . . . a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.").

Plaintiffs have alleged facts that plausibly suggest that Superintendent Brown was the final policymaker for CPD's response to the summer 2020 protests. Plaintiffs allege that pursuant to the relevant Chicago code provisions, Defendant Superintendent Brown is responsible for the general management and control of CPD and has full and complete authority to administer the Department. Second Am. Compl. ¶ 96 (citing Chicago Municipal Code § 2-84-040). Plaintiffs allege that Superintendent Brown promulgated rules, regulations, policies, and procedures of the CPD. *Id.* ¶ 74. Plaintiffs further allege that Superintendent Brown made all command decisions about the CPD's systematic response to protesters during the 2020 protests. *Id.* ¶ 96; *see Vodak v. City of Chicago*, 639 F.3d 738, 747–48 (7th Cir. 2011) (finding that the Superintendent of Police was the final policymaker for the Chicago Police Department during the March 2003 mass anti-Iraq War demonstration for purposes of *Monell* liability).

Plaintiffs have also alleged facts that plausibly suggest that their constitutional injuries were caused by Superintendent Brown's actions. Plaintiffs allege that Superintendent Brown, through actions both explicit and implicit, authorized and directed the officers' unlawful conduct at the summer 2020 protests. *Id.* ¶ 96. Plaintiffs allege that Superintendent Brown encouraged and permitted CPD officers to target, attack, and harass protesters with violent animus and took

no action to halt CPD officers' systemic violence against the protesters. *Id.* Plaintiffs further allege that Superintendent Brown maintained the widespread practices of CPD officers using excessive force and falsely arresting protesters and was deliberately indifferent to the constitutional rights of Plaintiffs. *Id.* ¶ 1200. Plaintiffs allege that Superintendent Brown was deliberately indifferent to the need for further officer training, supervision, and discipline related to the use of force against protesters. *Id.* ¶ 1202.

Defendants do not dispute that Superintendent Brown was the final policymaker for CPD's response to the summer 2020 protests. Instead, Defendants contend that "Plaintiffs have alleged that Superintendent Brown directly violated the City's policies—which are contained in the Consent Decree—when he supposedly allowed and encouraged the constitutional violations to occur," and therefore Plaintiffs have failed to state a basis for *Monell* liability. Defs. Mot. at 21. However, Defendants' argument misses the mark. The operative policies here are not the provisions of the Consent Decree. Plaintiffs have clearly alleged that the City and CPD have been non-compliant with the provisions of the Consent Decree and as a result have failed to implement the necessary policies relating to use of force, impartial policing, crisis intervention, and accountability that could have prevented the constitutional violations at the summer 2020 protests. Second Am. Compl. ¶¶ 1118, 1122. Instead, the operative policies at play during the summer 2020 protests were the widespread unconstitutional practices of CPD that were maintained and encouraged by Superintendent Brown. *Id.* ¶¶ 96, 1200. Thus, Superintendent Brown did not, as Defendants suggest, directly violate the City's existing policies. Rather, Superintendent Brown was in fact implementing CPD's widespread policies and practices that caused Plaintiffs' injuries.

Defendants' reliance on *Lanahan v. County of Cook* is thus unavailing. No. 16-cv-11723, 2018 WL 1784139 (N.D. Ill. Apr. 13, 2018). The court in *Lanahan* dismissed the plaintiff's *Monell* final policymaker claim because it found that the plaintiff failed to demonstrate that the person with policymaking authority for the County, Inspector General Blanchard, set the policy at issue. *Id.* at *12. The court explained that the policy at issue—the County's policy of investigating claims of political discrimination and retaliation—is set forth in the Shakman consent decree. *Id.* The court found that the plaintiff's allegations suggesting that Blanchard had "run afoul" of the Shakman decree by investigating her claims in a fraudulent manner were not sufficient to establish municipal liability. *Id.* Here, by contrast, Plaintiffs are not merely alleging that Superintendent Brown has "run afoul" of the Consent Decree, but rather that he encouraged and maintained—as the final policymaker—unconstitutional policies and practices within CPD that also happen to be in defiance of the Consent Decree. And it was those unconstitutional policies and practices that Superintendent Brown furthered and implemented during the summer 2020 protests that caused Plaintiffs' injuries. *See Vodak*, 639 F.3d at 748 ("All that matters in this case is that Chicago's police superintendent has sole responsibility to make policy regarding control of demonstrations. He was in his headquarters throughout the March 20, 2003, demonstration, not only monitoring it but also approving the decisions of his subordinates, specifically their decisions to shield Michigan Avenue from the marchers and to make the mass arrests of the people trapped on Chicago Avenue. The superintendent *was* the City, so far as the demonstration and arrests were concerned.").

Plaintiffs' allegations therefore are sufficient to state a claim for municipal liability based on the actions of Superintendent Brown as the final policymaker for CPD's response to the summer 2020 protests. *See, e.g.*, *Fix*, 2022 WL 93503, at *3 (refusing to dismiss plaintiffs'

*Monell* claim even though "plaintiffs did not specifically name a final policymaker for the City who was aware of the widespread practice and failed to act" because "plaintiffs have set forth sufficiently detailed facts that the City's policymakers were aware of Chicago Police Officers using excessive force"); *Logan v. City of Evanston*, No. 20 C 1323, 2020 WL 6020487, at \*6–7 (N.D. Ill. Oct. 12, 2020) (denying the City of Evanston's motion to dismiss the plaintiffs' *Monell* claim where plaintiff plausibly alleged that the chief of police was a final policymaker with respect to the matters at issue involving police investigations); *Smith*, 143 F. Supp. 3d at 753–54 (allowing plaintiff's *Monell* claim to proceed based on "Defendant Superintendent McCarthy's deliberate acts as a decision-maker with final policy-making authority"); *Spalding v. City of Chicago*, 24 F. Supp. 3d 765, 774–75 (N.D. Ill. 2014) (finding that plaintiff sufficiently pleaded a *Monell* final policymaker claim based on his allegations that three police chiefs, who the CPD Superintendent delegated authority to, were the City's policymakers for the events at issue).

Accordingly, Plaintiffs' *Monell* claim against the City and Superintendent Brown in his official capacity based on the final policymaker theory should not be dismissed.

## III. Plaintiffs Have Properly Alleged a Failure to Intervene Claim Against Superintendent Brown (Count VIII)

Defendants seek dismissal of Count VIII, contending that Plaintiffs' allegations are generic and inadequate to support a claim for failure to intervene against Superintendent Brown. Def. Mot. at 23–26. Defendants' contention must be rejected.

To state a failure to intervene claim, Plaintiffs must allege that Superintendent Brown: (1) had reason to know that officers were using excessive force or committing constitutional violations; and (2) had a realistic opportunity to intervene to prevent the harm from occurring. *Lewis v. Downey*, 581 F.3d 467, 472 (7th Cir. 2009); *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005); *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). "A 'realistic opportunity' means a

chance to warn the officer using excessive force to stop." *Miller v. Gonzalez*, 761 F.3d 882, 826 (7th Cir. 2014); *see also Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) ("This Court has implied that a 'realistic opportunity to intervene' may exist whenever an officer could have 'called for a backup, called for help, or at least cautioned [the excessive force defendant] to stop.'" (citation omitted)).

First, Plaintiffs have alleged facts that plausibly suggest that Superintendent Brown knew that officers under his supervision and control were using excessive force and committing constitutional violations against Plaintiffs and other protesters during the protests in the summer of 2020. As explained above, Plaintiffs allege that Superintendent Brown made all command decisions about the CPD's systematic response to protesters during the 2020 protests, and that he authorized and directed the officers' unlawful conduct at the protests. Second Am. Compl. ¶ 96. Specifically, Plaintiffs allege that Superintendent Brown encouraged and permitted CPD officers to target, attack, and harass protesters with violent animus. *Id.* Plaintiffs allege that Superintendent Brown was physically present for at least one protest on August 15, 2020, where he stood shoulder to shoulder with CPD officers who kettled, brutally beat, sprayed with chemical agents, and/or falsely arrested five Plaintiffs (Romano, Dittman, Baskaran, Pfeifer, and Atchley) and other protesters. *Id.* ¶¶ 96–97, 948–1044. Plaintiffs further allege that Superintendent Brown attempted to justify and/or conceal his officers' unlawful conduct at the August 15, 2020 protest by making a number of false and misleading statements to the media, including that protesters became confrontational and began assaulting officers, and that officers did not engage in the practice of kettling. *Id.* ¶ 97. Moreover, Plaintiffs allege that during the 2020 protests, Superintendent Brown received a memo from COPA's Chief Administrator, Sydney Roberts, informing him of the ongoing misconduct of officers that was consistent across

multiple complaint investigations and urging him to take immediate action to address the deficiencies. *Id.* ¶ 95. Despite Defendants' assertions to the contrary, these allegations are not generic or conclusory. Rather, it is reasonable to infer from these allegations that the constitutional violations were committed by CPD officers with not only Superintendent Brown's knowledge, but with his direction and authorization.

Second, Plaintiffs have alleged facts that plausibly suggest that Superintendent Brown had a realistic opportunity to prevent the constitutional violations and yet failed to do so. Based on Plaintiffs' allegations, Superintendent Brown certainly had the authority and discretion to caution officers to stop their unlawful conduct and instead chose to authorize and direct their unlawful conduct. *Id.* ¶ 96. Defendants argue that "Plaintiffs have not sufficiently alleged that Superintendent Brown was present for any of the underlying alleged violations with a realistic opportunity to prevent them." Defs. Mot. at 25–26. Defendants are wrong. Specifically, with regard to the August 15, 2020 protest, Plaintiffs do allege that Superintendent Brown was present and standing shoulder to shoulder with officers who committed constitutional violations. Second Am. Compl. ¶¶ 96-97. As the highest ranking officer in the CPD, every action taken on the scene was at his direction and/or taken under his supervision. It is certainly reasonable to infer from Plaintiffs' allegations that Superintendent Brown personally observed the constitutional violations occurring against Plaintiffs and other protesters and could have, but chose not to, intervene to stop officers from committing the violations. *See, e.g.*, *Crusick v. Gualandri*, No. 20-cv-06017, 2021 WL 5447041, at *7 (N.D. Ill. Nov. 22, 2021) (finding that plaintiff sufficiently pleaded a failure to intervene claim where plaintiff simply alleged that "Defendants stood by without intervening to prevent the violation of [his] constitutional rights, even though they had the duty and the opportunity to do so" and did not include any specific allegations about

the defendants' involvement or opportunity to intervene); *Lark v. City of Evanston*, No. 16 C 4630, 2017 WL 41361, at *5 (N.D. Ill. Jan. 31, 2017) (finding that plaintiffs sufficiently stated a claim for failure to intervene where plaintiffs alleged that multiple officers were present and had time to confer and intervene in the unreasonable search and seizure of plaintiffs because "[a]llegations of knowledge need only be general" at the motion to dismiss stage); *Clark v. City of Chicago*, No. 10 C 1803, 2010 WL 4781467, at *6–7 (N.D. Ill. Nov. 17, 2010) (finding that plaintiffs pleaded sufficient facts to support their claims against defendants for failing to intervene to prevent the use of excessive force).

Additionally, Superintendent Brown can also be held liable for failing to intervene to stop the constitutional violations that occurred at the protests where he was not physically present. Defendants assert that courts have "held routinely that officers who are not present at the scene of alleged constitutional violations generally do not have a realistic opportunity to prevent them." Defs Mot. at 24. However, courts have also held that in situations, like here, where plaintiffs allege systemic abuse by officers that is well known by supervisors, those supervisors can be held liable for failing to intervene to stop the systemic abuse. *See, e.g.*, *Smith*, 222 F. Supp. 3d at 687 (finding that supervisors who "had knowledge of the systemic torture leading to coerced confessions of innocent individuals, but nevertheless condoned it or turned a blind eye to it" could be held liable for failing to intervene to prevent officers from continuing the coercing interrogations and torture tactics; the "fact that [the supervisors] were not at Area 2 at the time of Plaintiff's torture and coerced confession does not absolve these Defendants under Plaintiff's theory of liability"); *see also Baker v. City of Chicago*, 483 F. Supp. 3d 543, 559 (N.D. Ill. 2020) (refusing to dismiss plaintiffs' failure to intervene claim where plaintiffs "have plausibly alleged that Defendant Officers and Defendant Supervisory Officers had the opportunity to put a stop to

the misconduct by refusing to participate or cover it up, by disciplining the responsible officers, or by seeking outside help" yet they failed to do so").  As explained above, Plaintiffs allege that Superintendent Brown was well aware of the widespread practices of CPD officers using excessive force and falsely arresting protesters, that he maintained and encouraged those practices at the summer 2020 protests, and that he took no action to halt the officer's systemic use of violence against protesters.  Second Am. Compl. ¶¶ 96, 1200–02.  Thus the fact that Superintendent Brown was not physically present at the other protests where Plaintiffs were injured does not absolve him of liability for failing to intervene to stop those Plaintiffs' injuries.

Accordingly, Plaintiff's failure to intervene claim against Defendant Superintendent Brown should not be dismissed.

## IV.     Plaintiffs Have Properly Alleged Respondeat Superior and Indemnification Claims Against the City (Counts XVII and XVIII)

Defendants argue that "to the extent this Court dismisses any state law claims against any of the Defendant Officers, it must also dismiss the related respondeat superior and indemnification claims against the City."  Defs. Mot. at 26.  Plaintiff does not refute this contention.  However, the Defendant Officers have not moved to dismiss any of Plaintiffs' claims and Plaintiffs have sufficiently pleaded all their claims (including their state law claims) against the Defendant Officers.  Accordingly, Plaintiffs' respondeat superior and indemnification claims against the City must remain

## CONCLUSION

For the foregoing reasons, this Court should deny Defendants' Combined Motion to Dismiss in Part Plaintiffs' Second Amended Complaint.

Respectfully submitted,

/s/ Vanessa del Valle
Vanessa del Valle
Roderick and Solange MacArthur
Justice Center
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, IL 606611-3609
312-503-5932

/s/ Sheila A. Bedi
Sheila A. Bedi
Community Justice and Civil Rights Clinic
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, IL 60611-3609
312-503-8576

Joey L. Mogul, Janine Hoft, Ben Elson
Jan Susler, Brad Thomson
People's Law Office
1180 N. Milwaukee Ave.
Chicago, IL 60642
773-235-0070

**Counsel for Plaintiffs**


## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that the foregoing document was electronically

served on all counsel who have filed appearances in this case via the Court's CM/ECF system

on February 11, 2022.

/s/ Vanessa del Valle